585 P.2d 1213

**The STATE of Arizona, Appellee,**

v.

**Willie Luther STEELMAN, Appellant.**

**No. 3299.**

Supreme Court of Arizona,
In Banc.

Sept. 13, 1978.

Rehearing Denied Oct. 17, 1978.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Atty. Gen. by William J. Schafer, III, Thomas G. Bakker, Crane R. McClennen, Asst. Attys. Gen., Phoenix, for appellee.

John M. Neis, Pima County Public Defender by Robert B. Norgren, Kenneth J. Peasley, Asst. Public Defenders, Tucson, for appellant.

CAMERON, Chief Justice.

Defendant, Willie Luther Steelman, was charged in two indictments by a Pima County grand jury with one count of burglary, A.R.S. § 13–302; one count of kidnapping for robbery with a gun, A.R.S. §§ 13–491, 492; two counts of robbery armed with a gun, A.R.S. §§ 13–641, 643(B); and two counts of first degree murder, A.R.S. §§ 13–451, 452, 453. The defendant was tried in Apache County and a jury found him guilty of all charges on 23 July 1975. On 27 August 1975, the trial court entered a judgment of guilt on all charges and the defendant received the following sentences: not less than 10 nor more than 15 years imprisonment in the state prison on the burglary conviction; not less than 46 nor more than 50 years imprisonment in the state prison for the kidnapping conviction; not less than 25 nor more than 30 years imprisonment in the state prison on each robbery conviction; and the death penalty for each murder conviction. Notice of appeal in this court was filed by the Clerk of the Court in Apache County. A.R.S. § 13–1711; Rule 26.15, Rules of Criminal Procedure, 17 A.R.S.

The issues presented for consideration are:

1. Whether certain statements made by defendant to police officers were involuntary and should have been suppressed.

2. Whether the M'Naghten test for insanity was the proper test of criminal responsibility in light of (a) A.R.S. § 13–135 which exempts lunatics, (b) the Eighth Amendment to the United States Constitution, and (c) the protections conferred by the Four-

teenth Amendment to the Constitution.

3. Whether the motion under Rule 11, Rules of Criminal Procedure, 17 A.R.S., made by defendant's counsel during the trial should have been granted.

4. Whether two of the State's psychiatrists should have been prohibited from testifying because the information upon which they relied was obtained under the doctor-patient privilege or in violation of the defendant's privilege against self-incrimination and his right to counsel.

5. Whether certain medical testimony was based on incompetent evidence or was a violation of the defendant's right to confront witnesses under the Sixth Amendment to the United States Constitution.

6. Whether a psychiatrist called by the defense should have been allowed to testify in surrebuttal to the State's rebuttal to the insanity defense.

7. Whether the defendant's insanity defense was rendered impotent because the surrebuttal witness was excluded and the State's psychiatrists were allowed to testify.

8. Is the Arizona death penalty statute, as construed, contrary to the Eighth Amendment to the United States Constitution?

The events leading up to the acts which form the basis of the charges in the instant matter are not in serious dispute and are part of a series of incidents which began in the late summer of 1973 when defendant Steelman left California for Denver, Colorado. In Denver, Steelman began to associate with one Douglas Gretzler. Steelman and Gretzler came to Phoenix, Arizona, in the fall of 1973 where a murder for hire resulted in the death of an accomplice named "Preacher" as well as the victims.

After this, Steelman and Gretzler kidnapped two young men and took them and their van to California where they killed them, stripped their bodies and placed them in some bushes near the road. Steelman and Gretzler later abandoned the van, obtained another vehicle, and drove back to Arizona. On the way back, they picked up a hitchhiker and killed him, together with two others who might have been able to give information regarding the kidnapping.

Steelman and Gretzler then went to Tucson where Steelman killed one Willie Sierra at a point near Gates Pass. They took money from the victim and used it to buy drugs which they used at a "crash pad" where they stayed for several days.

Then commenced a series of events on which the present convictions are based. Steelman and Gretzler were hitchhiking in the general vicinity of the University of Arizona in Tucson, Arizona. On Euclid Avenue between Grant and Speedway, they were picked up by Vincent Armstrong, a former Tucson police officer who was then a student at the University of Arizona. Steelman climbed into the back of Armstrong's 1969 Firebird and Gretzler got into the front on the passenger's side. Once the car began to move, Steelman thrust a gun at Armstrong's ribs and began to instruct him to drive north toward the desert. Armstrong then acted frightened and told them he was too nervous to drive. On Steelman's direction, Armstrong pulled the car over into a church parking lot and crawled over the console while Gretzler walked around to the driver's side. Once the car began to move again and had reached about 30 or 35 miles per hour, Armstrong dove out, rolled over on the ground, picked himself up and began to run in the direction opposite the one taken by the car. Armstrong escaped and notified the police.

Steelman and Gretzler were next seen by James Nelson, sales manager of the Villa Pariso condominiums on Fort Lowell Road, who observed them in the Firebird driving slowly down the street as though looking for an address. Nelson later saw them on the grounds of the complex and, as he testified, assumed that they were workmen working on the still uncompleted complex. Nelson encountered them again as he completed his daily inspection tour; this time they asked him where the Sandbergs lived.

The Sandbergs lived in one of the four or five occupied units of the complex so Nelson directed them to that condominium.

Rather than going to the Sandberg home, Steelman and Gretzler accosted a man they saw in the parking lot who was washing his car. The man was Michael Sandberg whose home they had inquired about earlier (apparently by coincidence). After Steelman displayed a gun he was carrying, Sandberg led the way back to his condominium. On the way they again encountered Nelson who greeted Sandberg warmly. Sandberg made very little, if any, reply which Nelson testified was completely out of character for Sandberg who was generally outgoing and cheerful. Nelson said that he came to within three feet of Steelman and Gretzler in a face-to-face encounter and was able to identify them.

The three men went into the Sandberg condominium where Sandberg's wife Pat was studying. Steelman and Gretzler first set about to change their appearance. With Pat Sandberg's assistance, Gretzler dyed his hair a darker shade. Steelman shaved his mustache and redid his hair. Steelman and Gretzler exchanged their "grubby" jeans and tee shirts for Michael Sandberg's slacks and sport coats.

The Sandbergs were then tied up with some twine found in the condominium. They were also gagged. The couple was then put in the bathroom while Steelman and Gretzler finished their other preparations to leave. After about an hour in the bathroom, Pat Sandberg apparently became upset and was given some of her own Valium to calm her down. Steelman untied her and had her sit in the living room so she could answer the door if anyone came. Steelman went down to the car to see who was there and had her go with him so she could introduce him as her brother. Michael Sandberg was moved to the bedroom and his feet were bound with the twine running back up to his neck, which was also bound with the twine. About 6:00 p. m., when it was dark and they were certain that the sales manager had left, Pat Sandberg was again tied with the twine, though

this time her feet were also bound. Gretzler went into the bedroom and shot Michael Sandberg one time in the head, covering the gun with a pillow so there was no noise. He then returned to the living room where Steelman had turned Pat Sandberg's face to the couch so she "couldn't see it coming." Gretzler came out of the bedroom and shot her in the head. Steelman wasn't satisfied and took the gun and shot her once more.

After the shootings, Steelman and Gretzler wiped down the condominium as thoroughly as possible to eliminate fingerprints, gathered up the things they had decided to take with them, including an expensive camera and other items belonging to the Sandbergs, took the Sandbergs' car and drove back to the house where they had arranged to meet with three others. Donald Scott was there but the two others had not arrived and Steelman and Gretzler decided not to wait. They then left with Donald Scott traveling toward California. They told Scott the car was stolen but did not tell him about any of the other events of the day.

They stopped in Casa Grande where they tried to rent a motel room with a credit card but were unable to because the card had expired. Scott testified that he saw the name "Michael Sandberg" on the card that Steelman tried to use. In Stanfield, they stopped at Vic's Highway Motel located at the junction of I–8 and Highway 84. The rooms were paid for with an American Express Card issued to Michael Sandberg.

The next day they had the car worked on at a service station in Stanfield and cashed a check drawn on the Sandberg account. Scott testified that some time that day they took a walk in the desert and Steelman and Gretzler told him the story that they had decided to use: Gretzler was driving Steelman to his mother's funeral and Scott was a hitchhiker they had picked up along the way. They also told Scott to let them know if things "got to be too much" for him and they would let him leave.

As they approached Yuma, they pulled over into a rest area where they were subjected to a routine check by Officer Charles Wright of the Arizona Highway Patrol.

Officer Wright checked Gretzler's driver's license and talked briefly with Steelman. Then he talked with Donald Scott. Scott was given the most "hassle" by the officer since he was the most disreputable looking member of the group. After asking Scott several questions, especially about his lack of gear, he let them go.

Crossing into California, they stopped at a small motel in Ocotillo, California, about twenty-seven miles from El Centro. They arrived about 11:30 and registered with Mr. and Mrs. Francisco, the owner-managers of the motel. Steelman used Michael Sandberg's American Express Card as identification for the check used to pay for the motel room. The manager also testified that she saw a veteran's card which identified him as Captain Michael Sandberg. Mrs. Francisco wrote the credit card number on the back of the registration card along with notations regarding the veteran's card, the names on the check, the address and phone number. She also noted the type of car and the license number on the card.

The next day, according to Scott, they continued west toward San Diego. At this point, Scott told his two companions that he wanted to go it alone. Steelman and Gretzler let him off the next time they stopped for gas in Pine Valley, California. Scott hitchhiked back to Tucson.

Steelman and Gretzler then made their way to Victor and Lodi in San Joaquin County, California. During this time, nine more people were murdered. Steelman and Gretzler were sought for the slayings and their pictures were published in California newspapers. In addition, the San Joaquin Sheriff's Office received word from the Maricopa County Sheriff's Office that the pair were wanted on robbery and homicide charges in Arizona. Warrants were later sent to Stockton, the county seat of San Joaquin County.

Meanwhile, Sacramento, California, authorities were tipped off that Steelman and Gretzler were staying in a hotel in Sacramento. Gretzler was arrested in a hallway of the hotel. Gretzler told the officers that Steelman could be found in a nearby apartment.

Officers went to the apartment and set up a command post communicating with Steelman by loudspeaker. Steelman was with the tenant of the apartment, a girl named Melinda. Steelman initially refused to surrender and continued to refuse even after he was put on the air over a local radio station. The officers then fired tear gas at the dwelling and Steelman emerged and was taken into custody on the Maricopa County warrants. During the afternoon, Steelman was transferred to Stockton on the San Joaquin charges. He was not arraigned until the following morning, 9 November, when an attorney was appointed. Intensive questioning by different law enforcement agencies about various unsolved crimes began at this time.

At the time the defendant was taken into custody, the Sandberg slayings were unknown to Pima County authorities. It was only after Pima County authorities were told that a car registered to Michael Sandberg had been in Steelman's possession at the time of his arrest that they went to the Sandberg apartment in Tucson where the bodies of Michael and Pat Sandberg were found. Fingerprints later determined to belong to Steelman and Gretzler were found in the apartment. The same day, Pima County officers went to Stockton to question Steelman and Gretzler.

After trial and conviction in California, Steelman and Gretzler were extradited to Arizona on the charges arising from the Armstrong kidnapping and the Sandberg slayings. Steelman was tried separately to a jury which convicted him on all counts. The facts were not seriously contested. The defense was insanity and the defendant, testifying in his own behalf, admitted most of the evidence of the commission of this and other crimes. On 27 August 1975, judgments were pronounced and sentences imposed. Defendant appeals from the judgments and sentences.

## WHETHER THE DEFENDANT'S STATEMENTS SHOULD HAVE BEEN SUPPRESSED

During the two weeks following his arrest, defendant made numerous recorded

statements to police officers. After a lengthy suppression hearing, the court suppressed some of the statements on the ground that they had been obtained in violation of defendant's right to counsel. The trial court, however, held that statements made after 11:15 on 10 November 1973 were admissible. On appeal, Steelman claims that all of the statements should have been suppressed.

Steelman was brought to the Sacramento Police Station shortly before noon on 8 November 1973. At the suppression hearing, Steelman testified that questioning began as soon as he arrived. He claimed that he was strip-searched and then questioned about the Maricopa County charges for approximately one hour while in the nude. His response to the questioning was to assert his right to talk with a lawyer before answering any questions.

At approximately 2:30 p. m., Carl Ambrose, a San Joaquin County officer, interviewed Steelman briefly in the Sacramento jail. Ambrose advised defendant of his rights according to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and the defendant signed a waiver form. When Ambrose asked if he wanted to make a statement, Steelman replied that he would when the officers "found the white Datsun" (the Sandberg car). Then, apparently changing his mind, Steelman said that he had better wait until he had talked to an attorney. Ambrose interpreted this as an assertion of the right to counsel, ceased questioning and did not talk to the defendant again until 10 November.

Later in the afternoon of 8 November and after his arrival in Stockton, Steelman talked to Douglas Barr, an employee of the Sheriff's Office who had gone to school with defendant. Barr asked how Steelman had come to do these things. Steelman asked Barr to get a doctor. Steelman claimed that he had been struck by a tear gas cannister during arrest and that drugs he had taken before the arrest were beginning to wear off and he was suffering withdrawal symptoms from heroin usage. Barr told him that a doctor was available.

Although Steelman claimed that these symptoms continued during the next few days, none of the officers who saw Steelman during that time and who testified at the suppression hearing indicated that Steelman's symptoms were severe.

Steelman was booked and then taken to his cell and left alone for some time. Although Steelman claimed that he was not booked until the middle of the night and that he only had a couple of hours alone in his cell, the officers testified that he was booked at 10:45 p. m. and that he was not significantly disturbed until early morning when he was taken down for fingerprinting and photographing.

During the morning of 9 November, Steelman was arraigned and an attorney was appointed. Apparently there was little time to confer and it is not clear when Steelman first had an opportunity to confer with the attorney. The lawyer did have time, however, to advise Steelman not to talk with law enforcement officers until there had been time for a thorough discussion about the case.

In the early morning hours of 10 November, Sgt. Larry Bunting of the Tucson Police Department and Michael Tucker of the Pima County Sheriff's Office, spoke briefly with both Steelman and Gretzler. Steelman refused to waive his rights to an attorney. Bunting mentioned that Arizona had the death penalty which Steelman later testified he interpreted to mean that he could avoid the death sentence if he pled guilty. Bunting testified that this was not what he meant.

At 10:25 a. m. on 10 November, Steelman was interviewed by David Arellanes and Bill Miller of the Maricopa County Sheriff's Office. They advised him of his rights and told him that they didn't want to talk to him about the California charges. Steelman signed the waiver card and made an incriminating statement to the officers. During the session, Arellanes mistakenly told Steelman that Arizona did not have the death penalty.

The Pima County Officers, after talking with the Maricopa County officers, inter-

viewed Steelman again. Even though Steelman had asserted his right to an attorney the night before, they decided to talk with him again when they learned about the other statement. After separate warnings and an agreement by the officers not to allow the statement to be used in California, Steelman made a statement to each officer. Steelman claims that his understanding about the death penalty and his physical condition were the reasons for making both statements. These statements and all others made by Steelman up to this time were suppressed by the trial court and are mentioned only as they may have had an effect, as Steelman insists they did, on the later statements which were admitted.

On the evening of 10 November, Steelman sent a note to Ambrose and Kenneth Wagner, another San Joaquin County officer, asking them to talk with him. They received the note at 10:15 p. m. The note stated:

"* * * 11–10–73, I, Willie Steelman, would like to see Ambrose or Wagner. Signed Willie Steelman. Witnessed Deputy M. K. Mann, Number 4772."

Steelman was again advised of his rights and Ambrose asked him if he wanted his attorney to be called. A waiver of the right to an attorney was signed at 11:15 p. m. and Steelman made an extensive statement with the session continuing until about 1:30 a. m. The statement covered the Sandberg killings and the Armstrong kidnapping.

Steelman testified that the reason he sent the note was that he wanted to see his girlfriend and thought that this was the only way to do it. He also testified that he was tired of hassling and that telling another officer wouldn't make any difference at that point.

At 9:00 a. m. on the 11th, the Maricopa County officers returned and obtained another statement. The warnings were given and Steelman acknowledged his rights before providing the information.

That evening, Sgt. Wagner returned to the jail to talk to Steelman about some of the details of the statement taken the night before. When Wagner arrived, he found Steelman's court-appointed attorney preparing to confer with the defendant. The attorney asked Wagner to wait for a few minutes while he conferred with his client. The conference lasted almost two hours and at its conclusion, the lawyer told Wagner that Steelman had told him about a crime which was about to happen in Tucson. Wagner took Steelman's statement about this crime in the presence of the attorney. The lawyer made no comment to Wagner about further conversations with his client before he left. After reading the *Miranda* warnings, Wagner took another statement concerning both the California and Arizona charges.

The final statement was taken more than a week later (19 November 1973). Larry Hust of the Tucson Police Department gave Steelman the appropriate warnings and Steelman waived his rights. Hust testified that he had relied on all of the information which had been gathered in preparing for the interview. Although he testified that he felt better physically, Steelman testified that he made the statement because his lawyer had told him that he had blown everything and thus he felt that telling another would make no difference.

■ A statement may be inadmissible as involuntary for one of three reasons: (1) it may be involuntary on its own in that it was the result of impermissible conduct by law enforcement officers at the time it was taken, see *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); (2) it may also be involuntary because earlier coercive pressures have not been dispelled, *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); or (3) it is directly derivative of a prior involuntary confession, *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

■■ It is clear that Steelman asserted his right to counsel from the beginning. Once an accused asserts his desire for an attorney, all interrogation must cease until an attorney is present. *Miranda v. Arizona,* supra; *Michigan v. Mosley,* 423 U.S. 96, 96

S.Ct. 321, 46 L.Ed.2d 313 (1975). Statements in the interim will be inadmissible. This does not prevent the accused, however, from changing his mind and deciding that he wants to talk to the police, and an accused may waive the presence of counsel and law enforcement officers may question him without notifying counsel. *United States v. Zamora-Yescas,* 460 F.2d 1272 (9th Cir. 1972), cert. den. 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972). But as our Court of Appeals has stated:

"* * * After the initial request for counsel is made, a later waiver by the accused can be voluntarily made, but the State bears a heavy burden of proving the voluntariness of the later waiver and any statements made. *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968). * * *" *State v. Grange,* 25 Ariz.App. 290, 294, 543 P.2d 128, 132 (1976).

■ There is, we believe, no question that the defendant did, in fact, waive his right to counsel and that the State has borne the "heavy burden" of showing that the later waiver of counsel was voluntary.

We then have no difficulty with the question of coercion as to the statements made after the note of 10 November. Steelman was informed of his rights. He understood them and he waived them. We find no impermissible conduct on the part of the law enforcement officers at the time the admitted statements were given.

Neither do we find that earlier coercive pressures were carried over to the admitted statements so as to make them the product of prior coercion.

■ To show that there were earlier coercive pressures, Steelman claims that Douglas Barr's talk to him was impermissible coercion. Use of a friend to obtain a confession was held to make the statement involuntary in *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). *Spano* is not directly applicable since Barr did not obtain a confession.

Steelman also contends that he was promised by Sergeant Bunting that if Steelman cooperated with Arizona authorities, he would avoid the death penalty. At the hearing, the officer stated that he had told Steelman that he would be charged in Arizona and he should keep in mind that the State had the death penalty while considering whether to talk with them. About ten hours after this conversation, Steelman made his first incriminating statement to law enforcement officers. He talked with Maricopa County officers at length on the condition that the statement could not be used in California. This was immediately followed by a statement to Pima County officers wherein Steelman stated that the death penalty was a factor in his decision to make a statement.

■ A similar question was presented in *State v. Jordan,* 114 Ariz. 452, 561 P.2d 1224 (1976), remanded — U.S. ——, 98 S.Ct. 3138, 57 L.Ed.2d 1157, (1978). In that case, it was held that a statement about the death penalty must clearly be a promise and must have been relied upon by the defendant in making the statement. The statement at issue in *Jordan* was not clearly a promise because it was expressed as a possibility and the opinion of the officer. In the instant case, there was not even that. Even though Steelman indicated he thought it was a promise, a fair reading of the statements at the time he was interrogated as well as Steelman's statements at the suppression hearing indicate that not only did he not have any justification to rely on the officer's statements that he would not receive the death penalty if he talked, but that he did not in fact rely on them.

Steelman also contends that his physical condition exacerbated any pressure created by the interrogations to the point where they became unduly coercive. The trial court specifically found that the drug intoxication was not a factor impelling the statements. In addition, there is no indication that Steelman's physical discomfort either from the injuries at the time of his arrest or later from heroin withdrawal was so great as to make him unduly susceptible to pressure. While there is no doubt that he was uncomfortable, the officers and doctors who saw him at this time uniformly testified

that his symptoms were minor and that Steelman appeared to be in control of himself and aware of his surroundings. Cf. *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977).

In *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the accused was arrested by local officers and, without any warnings, questioned throughout the night and the next morning. At noon, F.B.I. agents took over and gave the accused advisory warnings and obtained a statement. The United States Supreme Court held the later statement given to F.B.I. agents inadmissible because "the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation." *Westover*, supra, 384 U.S. at 497, 86 S.Ct. at 1639, 16 L.Ed.2d at 736. *Miranda* does not mean that after the warnings have been given and the accused has asserted his privilege that the accused can never voluntarily make statements that may be used in evidence. *Michigan v. Mosley*, supra. In the instant case, there was a definite break between the prior statements and the time Steelman indicated he wanted to talk to the officers. Steelman testified that he wanted to get in touch with his girlfriend and thought it would be easier to do if the detective tried than if he did so on his own initiative. There was sufficient evidence from which the trial court could find that the reason the defendant sent the note was to see his girlfriend and not as a result of any earlier coercion. At the time the defendant sent the note, he knew he had a right not to make a statement. The note was voluntary on his part and the resulting statements were not coerced by prior conduct of the law enforcement officers.

But Steelman contends that the totality of the circumstances including what he describes as non-stop interrogation, *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), and an interview by two county psychiatrists at the jail the evening he was arrested was coercion, *Leyra v. Denno*, supra, which was not dissipated at the time he waived his rights and made the admitted statement. We do not agree.

The evidence does not show a non-stop interrogation of the type mentioned in *Westover*, supra. It does not appear by his own testimony that he was overwhelmed or confused by the different interviews. As to the interviews with the two psychiatrists discussed later in this opinion, it does not appear that he was misinformed as to their purpose or intentions.

■ But Steelman also contends that the law enforcement agencies were sharing knowledge and that each officer who saw him was armed with information obtained from the last one who had talked with him. *Leyra v. Denno*, supra. We can assume that the officers did share information, but this does not mean that Steelman's decision to make a statement was the result of any earlier violations of his rights. We feel that any earlier coercive pressures, if indeed there were any, were dispelled by the time of the note and admitted statements.

■ Finally, Steelman contends that the later statements were derivative of prior inadmissible statements. Steelman testified that he felt his earlier statements had let the "cat out of the bag." *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). We do not agree. We do not find sufficient evidence to compel the trial court to find that Steelman's act in contacting the officers on the 10th and the later statements were the result of any previously suppressed statements. We believe the statements made after 11:15 on 10 November were properly admitted as being separate and independent statements and not derivative of any prior involuntary statements.

## PROPRIETY OF THE M'NAGHTEN TEST

Both the defense and the State presented extensive testimony at the trial in regard to Steelman's mental condition. Although there was sharp disagreement as to whether Steelman was, in fact, insane, all did agree that he suffered from one form or another of a personality disorder and most agreed that Steelman suffered from some

form of volitional defect. That is, that he was incapable of controlling his actions. The trial court, following Arizona case law, ruled that the only question before the jury was whether Steelman knew the nature and quality of his action at the crucial time or whether he could distinguish right and wrong. This is the M'Naghten test and it has been repeatedly sustained as the sole test of sanity in criminal cases in Arizona. See *State v. Schantz*, 98 Ariz. 200, 403 P.2d 521 (1965), cert. den. 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 530 (1966); *State v. Richardson*, 110 Ariz. 48, 514 P.2d 1236 (1973), cert. den. 415 U.S. 929, 94 S.Ct. 1439, 39 L.Ed.2d 487 (1974).

Both at trial and on appeal, however, Steelman challenges this test. He makes three claims in regard to the propriety of the M'Naghten test: (a) that the legislature intended another test by its enactment of A.R.S. § 13–135 which absolves lunatics from criminal responsibility; (b) that to punish him when it is clear that he is mentally ill is to punish him for his status and not for his conduct; and (c) that to apply the M'Naghten rule to him is a violation of his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution.

### a. Whether lunacy is another form of insanity

■ Steelman first contends that his disorder comes within the "legal" definition of lunacy and thus he should be excused from liability under A.R.S. § 13–135 which provides that:

"[a]ll persons are capable of committing crimes except:

\*　　\*　　\*　　\*　　\*　　\*

"2. Idiots, lunatics and insane persons."

We have recently considered this question in a case wherein the defendant urged that A.R.S. § 13–135 guaranteed him the right to interpose a distinct defense of lunacy. We stated:

"\* \* \* We are of the opinion that for purposes of the question of criminal responsibility, there is no legal difference between insanity and lunacy.

\*　　\*　　\*　　\*　　\*　　\*

"We therefore hold that there is no distinct defense of lunacy in this state differing from the defense of insanity. Since in this case the appellant was determined to be legally sane, the trial court acted properly in denying his motion to interpose a lunacy defense." *State v. Billhymer*, 114 Ariz. 390, 392, 561 P.2d 311, 313 (1977).

The test under A.R.S. § 13–135 is whether he knew the nature and quality of his action or whether he could distinguish right from wrong at the time of the commission of the offense. This question was properly presented to the jury. There was no error.

### b. Whether the conviction is based on defendant's illness

■ On the basis of the psychiatrist's testimony that Steelman's inability to control his conduct indicated an emotional disorder, defendant contends that his conviction is a violation of the Eighth Amendment to the United States Constitution in that it punishes him for his "status" of being mentally ill. Steelman cites *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) wherein the United States Supreme Court struck down a California statute which made drug addiction a crime. *Robinson* was carefully limited to the specific question of a statute which made the status of being a drug addict a crime. Later in *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), a person had been convicted for public drunkenness and it was claimed that because he could not abstain from drinking or controlling his conduct once he began drinking, it was a punishment of his status as an alcoholic to convict him of public drunkenness. A plurality of the court expressed doubt that alcoholism could be classified as a disease in the same way as drug addiction. However, a clear majority of the court found that the conviction under the public drunkenness statute was valid because the statute applied to conduct rather than "status" as an alcoholic.

In the instant case, the defendant is not being charged with the crime of being mentally ill. Even though Steelman's mental condition may have played a part in the crimes committed, Steelman is not being punished for being mentally ill any more than a person convicted for driving while intoxicated is being punished for being an alcoholic. The convictions are based on the acts of the accused and not on his emotional disorders. See *State v. O'Donnal*, 110 Ariz. 552, 521 P.2d 984 (1974). We find no error.

### c. Whether M'Naghten violates defendant's rights under the Fourteenth Amendment

Defendant next questions the application of the M'Naghten rule to defendant as being in violation of his rights under the Fourteenth Amendment: the Privileges and Immunities Clause; the Due Process Clause; and the Equal Protection Clause.

As to the Privilege and Immunities Clause, the argument is that because Arizona applies the harsher rule in the M'Naghten test, people are discouraged from entering the state and their constitutional right to free travel among the states has been impinged. See *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). We do not agree. The right to travel does not include crossing state lines in order to commit a crime. There is no violation of the Privileges and Immunities Clause in having different jurisdictions apply different rules to determine criminal responsibility.

Steelman bases his due process argument on the existence of a variety of tests applied in different state and federal jurisdictions around the country. Whenever a particular procedural protection is brought within the ambit of the Due Process Clause by the United States Supreme Court, it then becomes a uniform procedural rule to be followed in courts across the country. The United States Supreme Court has not held, however, that due process requires one rule of criminal responsibility. In *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the United States Supreme Court stated that it was not convinced that the state of medical art was such that a single rule of criminal responsibility was required for every state and federal court. Although the question of a due process standard for the sanity defense has been discussed by numerous state and federal courts and many of them have abandoned M'Naghten for what they have perceived to be a better rule, this court has decided to remain with the M'Naghten rule. *State v. Sisk*, 112 Ariz. 484, 543 P.2d 1113 (1975). We find no due process violation.

But Steelman contends further that the application of the M'Naghten rule to him is a violation of the equal protection of the laws. The basic rule of equal protection in criminal cases is that no person should be subject to a greater or different punishment than another in similar circumstances. See *Pace v. Alabama*, 106 U.S. 583, 1 S.Ct. 637, 27 L.Ed. 207 (1883). Steelman claims that all of those who have been diagnosed as mentally ill are similarly situated and therefore a rule which distinguishes among different forms of mental illness to determine criminal responsibility violates equal protection because some are punished and some are acquitted by reason of insanity. We do not agree.

The M'Naghten rule is not an attempt to define insanity or mental illness or to distinguish and discriminate among them. The M'Naghten rule is used to determine who should be held responsible for criminal conduct regardless of the nature of their mental illness. According to the M'Naghten rule, those who do not understand the nature and quality of their actions or do not know that what they do is wrong, are incapable of forming criminal intent. Any one of a variety of mental illnesses can result in an accused being unable to form a criminal intent under the M'Naghten rule. The question of the ability to form a criminal intent is the guiding principle and the rule covers all of those who fit that category regardless of the type or degree of mental illness. The rule,

therefore, does not create a classification among different mental illnesses. We find no error.

Steelman further contends, however, that his right to equal protection of the laws is violated by A.R.S. § 13–132:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive or intent with which he committed the act."

Steelman argues that this statute creates an impermissible classification in that it permits a person who has voluntarily intoxicated himself to present evidence of diminished capacity while a person suffering from a mental disorder with the same impact is not permitted to present evidence of the effect of his disorder on his ability to form specific intent. Again we do not agree.

■■■■ Voluntary intoxication is not a defense to a crime, but may be shown only to negate specific intent. *State v. Cooper*, 111 Ariz. 332, 529 P.2d 231 (1974). Insanity, however, is a defense to the crime itself and the M'Naghten rule is our test for such insanity. The statute, A.R.S. § 13–132, is directed to those people who have voluntarily intoxicated themselves to the point where they are incapable of forming a specific intent. We do not believe this is an impermissible classification. There is no violation of defendant's equal protection rights of the Fourteenth Amendment.

Finally, Steelman claims that all of his arguments about the validity of the M'Naghten rule should be considered in the context of this as a capital case. We do not agree. M'Naghten deals with the question of which individuals are capable of forming general criminal intent and should be punished. The death penalty raises the question of the kind of punishment which may

be imposed and must be considered separately under the Eighth Amendment. See *Leland v. Oregon*, supra; *Jackson v. Dickson*, 325 F.2d 573 (9th Cir. 1963), cert. den. 377 U.S. 957, 84 S.Ct. 1637, 12 L.Ed.2d 501 (1964). We find no error.

## MOTION UNDER RULE 11

Within a month of Steelman's return to Arizona, his counsel moved for an examination and hearing pursuant to Rule 11, Rules of Criminal Procedure, 17 A.R.S., in order to determine his competency to stand trial and his mental condition at the time of the offense charged. The motion was granted and three doctors, Dr. Jacob Hoogerbeets (requested by the defense), Dr. Allan Beigel (requested by the State), and Dr. Marshall Jones were appointed to examine Steelman. On 7 February 1975, the hearing was held and Steelman was found to be competent to stand trial on the basis of the reports submitted by the three doctors.

The question of Steelman's competency to understand and participate in the proceedings was again raised during the trial. On the morning of 14 July, defense counsel requested a hearing in chambers. Counsel reported that Steelman had requested that he be handcuffed during the proceedings because he felt that he would be unable to control himself. Steelman was brought in and asked about his condition. He told the trial court that he had been hallucinating through the night and into the morning and that this produced violent reactions which could cause him to injure himself or someone else. He claimed to have already injured himself by throwing his arm against the wall of his cell. Steelman requested either handcuffs or the drugs Quaalude, morphine or Demerol.

The court held a discussion with Steelman off the record with counsel present and consulted by telephone with Dr. Hoogerbeets in Tucson. The court stated that Dr. Hoogerbeets told him that there was no reason to be concerned about Steelman's mental condition; that this happened about every three weeks and that the defendant would use the situation to request Quaa-

lude, a barbiturate, or some other street drug. According to Dr. Hoogerbeets, Thorazine or Stelazine would be adequate.

Defense counsel then moved for a Rule 11 hearing. With the motion pending, the court recessed and had Steelman taken to nearby Springerville where he was examined by Dr. Heynekamp, a medical doctor who was not a psychiatrist. Dr. Heynekamp found that Steelman was able to assist counsel; he was rational and normal. One of the drugs recommended by Dr. Hoogerbeets was prescribed to calm his nerves but the defendant refused to take it claiming that it would make him "hyper" and cause hallucinations. The court denied the Rule 11 motion, but indicated that it was leaving open the possibility that the ruling could be changed depending on his observation of Steelman as the trial progressed. An arrangement was made permitting Steelman to sit in the courtroom without handcuffs by placing deputies on either side of him.

█ On appeal, Steelman contends that the trial court improperly found him competent to stand trial. We do not agree. The court had before it a motion requesting an examination and hearing under Rule 11. Rule 11.2 reads as follows:

> "At any time after an information is filed or indictment returned, any party may move for an examination to determine whether a defendant is competent to stand trial, or to investigate his mental condition at the time of the offense, or both."

Such examination and hearing must be held if there are reasonable grounds to support such an examination and hearing. Rule 11.3, Rules of Criminal Procedure, 17 A.R.S.; *State v. Messier*, 114 Ariz. 522, 562 P.2d 402 (1977); *State v. De Vote*, 87 Ariz. 179, 349 P.2d 189 (1960); *State v. Reid*, 87 Ariz. 123, 348 P.2d 731 (1960). Reasonable grounds exist if there is sufficient evidence to believe that the defendant is not able to understand the nature of the proceedings against him and to assist in his defense. *State v. Bradley*, 102 Ariz. 482, 433 P.2d 273 (1967); *State v. Messier, supra.*

█ We believe that the trial court properly exercised its discretion in finding that a Rule 11 examination was unnecessary. The question of Steelman's competency to stand trial had been ruled upon prior to trial, and although this previous determination was not binding upon the trial court, at the time the motion was again made it certainly could be considered by the court in ruling upon the motion during trial. This previous determination, based upon extensive examination and testimony, plus the court's own observations as well as the conclusion of a local medical doctor, were sufficient to support the trial court's ruling. We find no error. Compare *State v. McClendon*, 101 Ariz. 285, 419 P.2d 69 (1966), appeal after remand 103 Ariz. 105, 437 P.2d 421 (1968).

█ But defendant challenges this finding on the ground that Dr. Patricia White, a psychiatrist who had examined and treated defendant while he was in California, examined him during the trial and found him to be insane. Insanity is not the same thing as competency. Competency focuses on an extremely narrow issue: whether whatever is afflicting the defendant has so affected his present capacity that he is unable to appreciate the nature of the proceedings or to assist his counsel in conducting his defense. *United States v. McEachern*, 465 F.2d 833 (5th Cir. 1972), cert. den. 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972). Dr. White's medical diagnosis, while it may have been relevant to defendant's sanity defense, did not determine defendant's competency to stand trial.

## WHETHER THE STATE'S PSYCHIATRISTS SHOULD HAVE BEEN PERMITTED TO TESTIFY

At the trial, Steelman relied on the defense of insanity and called Dr. James Peale who had examined him in connection with some of the charges in California. Dr. Peale testified that Steelman was M'Naghten insane at the time of the Sandberg murders. To rebut this testimony, the State called four psychiatrists. Among them were Drs. Kenneth Rogerson and Robert

Austin who had examined the defendant on the day of his arrest.

Steelman contends that the admission of the testimony of the doctors was error for two reasons. First, Steelman contends that Dr. Rogerson and Dr. Austin should have been precluded from testifying because of the physician-patient privilege. Second, Steelman contends it was error to allow them to testify as to Steelman's sanity at the time of the crime based on their interviews of Steelman on the day of his arrest on the grounds that the interviews were in violation of Steelman's rights under the Fifth and Sixth Amendments.

a. Whether testimony based on interviews on the day defendant was arrested should be excluded

At the time of his arrest, Steelman claimed to be going through heroin withdrawal. He was sniffling, a symptom of withdrawal and claimed to have had his last "fix" on the evening of 6 November, two days prior to his arrest. On at least one occasion, he asked the interrogating officers to send a medical doctor who could relieve the withdrawal symptoms. Before receiving any medical treatment, however, Steelman was visited by two psychiatrists who were sent by the San Joaquin District Attorney's Office. These doctors were sent to evaluate Steelman's mental condition in terms of competence to participate in legal proceedings and in terms of his mental capacity at the time of the alleged crimes. This was standard procedure in San Joaquin County when an individual was arrested for a violent crime at a time close to its commission.

Dr. Kent E. Rogerson testified at the hearing on the motion in limine that he had told Steelman, after an officer in the Doctor's presence had advised defendant of his rights, that he would be reporting back to the District Attorney's Office. Steelman responded that he wanted a physical examination and the doctor replied that he would not perform one. Neither did Dr. Rogerson prescribe any drugs for Steelman. The interview lasted for about 70 minutes and

information and observations obtained during that interview contributed to his diagnosis of Steelman and to his opinion regarding the defendant's legal sanity.

Dr. Robert Austin interviewed Steelman later in the evening of 8 November. Dr. Austin initially determined that the *Miranda* warnings had been given and then told Steelman that he was a psychiatrist representing the District Attorney's Office and that anything Steelman said during the interview could be used against him in court. Steelman responded by asking for an attorney and saying that he would not discuss the case. However, he did agree to talk about himself in general. Although he said he noticed the sniffling, Dr. Austin testified that Steelman did not ask for any physical examination or treatment during this interview. The doctor also said that he did not prescribe any drugs as a result of the interview.

Steelman had testified about the interview during the hearings on the motion to suppress. He corroborated the statements of the two doctors in that neither gave him any treatment. However, he claims that he did not know that Dr. Rogerson was a psychiatrist until they were well into the interview and that he had initially assumed that the doctor had been sent to treat his illness. According to Steelman, Austin got him to talk by promising to help with the withdrawals.

■■■■ Steelman, relying upon his own testimony, argues that a doctor-patient relationship was created with each doctor. The doctor-patient privilege is created by statute in Arizona. A.R.S. § 13–1802:

"A person shall not be examined as a witness in the following cases:

\*      \*      \*      \*      \*      \*

"5. A physician or surgeon, without consent of his patient, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

In criminal cases, there is a well-established distinction between an examining and treating physician for purposes of applying

the privilege. There is no privilege when the defendant is examined on the orders of the court or prosecutor in regard to issues for trial except those provided by court rule. On the other hand, when the doctor is either going to diagnose or prescribe treatment for the defendant, the relationship will be created and the communications will be privileged. *State v. Evans*, 104 Ariz. 434, 454 P.2d 976 (1969).[1] Treating for this purpose is more than prescribing medication for superficial symptoms. See *State v. Evans*, supra. Yet if the patient believes the examination is for purposes of treatment, the privileges will apply even if there are also other purposes for the examination. See *State v. Shaw*, 106 Ariz. 103, 471 P.2d 715 (1970), cert. den. 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971).

█ In the case at bar, Steelman claimed that it had been his understanding during each interview that the doctors were treating him for his withdrawal symptoms. The doctors, on the other hand, testified that they made it clear that they were psychiatrists sent by the District Attorney's Office. The question of the existence of the doctor-patient privilege therefore was one of the credibility of the testimony. The admissibility of evidence turned on the trial court's determination of the credibility of testimony and was within the discretion of the trial court. Absent abuse, such discretion will not be overturned on appeal. *State v. Sturgis*, 113 Ariz. 311, 553 P.2d 665 (1976). We find no abuse in the instant case.

b. Testimony regarding defendant's sanity at the time of the crime

Steelman also contends that it was a violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel to allow the testimony of Drs. Austin and Rogerson who examined him the evening he was brought into the San Joaquin County Jail to testify concerning his sanity at the time of the crime.

█ Even though incriminating statements made by Steelman might not be admissible during the case in chief, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it does not follow that all use of the information obtained by the doctors is inadmissible. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The doctors did not testify in regard to the guilt or innocence of Steelman, but only as to their opinion of his sanity at the time of the crime. This was in response to Steelman's insanity defense. This limited use of the interviews was permissible. *Harris*, supra.

The argument that the testimony violates the privilege against self-incrimination arises from the fact that this was a psychiatric examination which took place before the defendant had raised the defense of insanity so there could be no implied waiver of privilege. *State v. Freeman*, 114 Ariz. 32, 559 P.2d 152 (1976); *United States v. Albright*, 388 F.2d 719 (4th Cir. 1968). This issue, however, was never adequately presented to the court below and we therefore are unable to consider it due to an inadequate record. See *United States v. Malcolm*, 475 F.2d 420 (9th Cir. 1973).

## WHETHER THE TESTIMONY BASED ON THE CALIFORNIA INCIDENTS SHOULD HAVE BEEN EXCLUDED

Except for reference to prior convictions in Steelman's direct testimony, no details concerning the California murders were introduced at trial. Each doctor was asked about the basis for his opinion on cross-examination. Dr. Gary Cavanaugh, one of the State's psychiatrists, said that his interview and police reports relating to the California charges had been considered by him in forming his opinion about the defendant's mental capacity. Dr. Austin stated that he had relied on information relating to the California charges.

1. But see Rule 11.7, Rules of Criminal Procedure, 17 A.R.S. If these examinations had taken place in Arizona pursuant to Rule 11, the defendant would have waived any privilege when he raised the sanity defense.

318

At the time of the trial in July 1975, the rule in Arizona prohibited a psychiatrist (or other expert) from giving an opinion which was based on facts which had not been presented in evidence. *State v. Drury*, 110 Ariz. 447, 520 P.2d 495 (1974); *State v. Gevrez*, 61 Ariz. 296, 148 P.2d 829 (1944). Thus, under the law at the time of the trial it was error to permit the Doctors Austin and Cavanaugh to testify as to an opinion which was based on facts not in evidence.

However, after the trial, we stated in the case of *State v. Clark*, 112 Ariz. 493, 543 P.2d 1122, decided on 19 December 1975, that the test is whether the information relied upon by the expert is of a kind normally relied upon by experts in the particular field in question. Under *Clark*, supra, the psychiatrists could base their opinions upon the facts of the California murders even though these facts were not in evidence. Defendant contends that *Clark* should not be applied retroactively as it would be an ex post facto law. We do not agree. The constitutional prohibition against ex post facto laws refers to legislation and not to judicial opinion. *Frank v. Mangum*, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915); *Ross v. Oregon*, 227 U.S. 150, 33 S.Ct. 220, 57 L.Ed. 458 (1913). But see *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). The *Clark* decision, while it admittedly changed a previous rule of evidence in Arizona, was not a change in the statutory law.

Neither does the constitutional prohibition against ex post facto laws apply to changes in the rules of evidence, whether statutory or court made. The United States Supreme Court long ago stated:

" * * * Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not ex post facto in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done, nor aggravate any crime theretofore committed, nor provide a greater punishment therefor than was prescribed at the time of its commission, nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. * * *." *Hopt v. Utah*, 110 U.S. 574, 589, 4 S.Ct. 202, 210, 28 L.Ed. 262, 268 (1884).

And:

" * * * If persons excluded upon grounds of public policy at the time of the commission of an offense, from testifying as witnesses for or against the accused, may, in virtue of a statute, become competent to testify, we cannot perceive any ground upon which to hold a statute to be ex post facto which "does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed. * * *" *Thompson v. Missouri*, 171 U.S. 380, 387, 18 S.Ct. 922, 924, 43 L.Ed. 204, 207 (1898).

In the instant case, the crimes for which defendant was charged, the punishment to be imposed, and the quantity or degree of proof necessary to convict remained the same; only the admissibility of certain evidence was changed. We find no ex post facto violation.

Steelman next contends that the doctors should not be allowed to base their testimony on the California murders because in order to keep evidence of the California murders out of the trial, Steelman was not able to effectively cross-examine the doctors concerning the reasons for their opinions. Steelman relies on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) where the United States Supreme Court held that it was a due process violation to prevent the defendant from cross-examining his own witness under the Mississippi voucher rule even though the witness was adverse to his interests. *Chambers* can be distinguished from the present case in that the result of the application of the voucher rule in *Chambers* was

that the defendant had no opportunity whatsoever to challenge the witness's testimony before the jury. In the instant case, Steelman was not precluded from cross-examination. He was permitted to present his case to the jury. There is, of course, always the danger in cross-examination of a witness that evidence damaging to the side asking the questions will be revealed. This is one of the risks of cross-examination. *Chambers* is not applicable and it was not a violation of the right of confrontation to permit the doctors to testify.

## DR. WHITE'S REBUTTAL TESTIMONY

The major defense at trial was that Steelman was insane at the time of the Sandberg slayings. In support, Steelman called Dr. James Albert Peale, a board-certified psychiatrist with extensive experience in public mental health and correctional psychiatry. Dr. Peale had examined Steelman twice: the first was in May 1974 at the request of the public defender's office in California and the second was just prior to his testimony at trial. Each interview was more than two hours in length. In addition, Dr. Peale was familiar with the confession which was introduced into evidence during the trial and the defendant's own testimony. On the basis of this information, Dr. Peale testified that he had diagnosed Steelman as having either schizophrenia or a schizophrenic reaction, paranoid type, and moreover, the doctor found that there was indication of organic brain damage of the kind currently associated with trauma. The doctor stated that, to a reasonable medical certainty, on the day the Sandbergs were slain, Steelman was insane according to the M'Naghten test.

On rebuttal, the State called four psychiatrists who had individually examined Steelman and who also were familiar with the confessions and Steelman's trial testimony. Three of these witnesses testified that Steelman was a sociopath and not a schizophrenic and that he was not M'Naghten insane at the time of the crimes. At the conclusion of the State's rebuttal evidence, the defense proposed to call Dr. Patricia

White in surrebuttal. Dr. White had been Steelman's treating psychiatrist from December of 1973 until May of 1974. The defense stated it did not intend to call Dr. White for testimony in regard to Steelman's legal sanity on the day of the crime, but in regard to her diagnosis of the defendant's pseudo-psychopathic schizophrenia. The State opposed the testimony on the ground that it was improper surrebuttal evidence as it should have been presented with the case-in-chief on the sanity defense. The trial court agreed and excluded the testimony. Steelman now claims this was reversible error.

■■■■■ The question of what evidence is to be considered proper surrebuttal is one of first impression in Arizona. There have been, however, several cases which had considered what evidence is appropriate on rebuttal. See *Central Copper Co. v. Klefisch*, 34 Ariz. 230, 270 P. 629 (1928); *Lowery v. Turner*, 19 Ariz.App. 299, 506 P.2d 1084 (1973). These cases indicate that the decision whether rebuttal evidence should be admitted is within the sound discretion of the trial court and generally will not be disturbed on appeal absent an abuse of that discretion. It follows that the discretion of the trial court in allowing surrebuttal testimony is even greater. Surrebuttal testimony is usually offered to explain away new evidence brought out in the rebuttal presentation or to impeach the testimony presented in rebuttal. Only in rare cases will it be error for the trial court to refuse to admit the testimony. Wigmore on Evidence § 1874.

■■■■ In the instant case, the State, in rebuttal, had contradicted the defense case of insanity without presenting new evidence. There was nothing in Dr. White's testimony which attacked the credibility or otherwise impeached the State's witnesses. The trial court was therefore not required to admit Dr. White's testimony in surrebuttal. We find no abuse of the trial court's discretion. *Lowery v. Turner*, supra.

■■■■ But Steelman also claims that the exclusion of Dr. White's testimony was a

violation of his rights under the Fifth and Sixth Amendments of the United States Constitution in that it violated Steelman's fundamental right to present his case by calling witnesses in his own behalf. By precluding Dr. White's testimony, he claims that he was prevented from effectively presenting his case to the trier of fact and therefore was denied the opportunity to be heard. There is no indication that Steelman was denied the right to call Dr. White as a defense witness when Steelman was presenting his case. Steelman instead waited until later and called Dr. White as a surrebuttal witness. By that time, Dr. White's testimony was merely cumulative of the evidence already presented by the defense. The addition of another doctor in surrebuttal who "votes" for the defense is not a sufficiently material addition to the case to reach constitutional proportions. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). We find no error.

## WHETHER DEFENDANT'S INSANITY DEFENSE WAS RENDERED IMPOTENT

Again relying on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), Steelman argues that by excluding both Dr. White's testimony and by permitting the State's doctors to rely on information about which Steelman felt he could not cross-examine them, Steelman was denied the opportunity to present his defense in violation of his rights under the due process clause.

■ *Chambers* can easily be distinguished from the present case. In *Chambers*, Mississippi's "voucher rule" prevented cross-examining one's own witness and the defendant in that case was prevented from careful questioning of a witness named McDonald about that witness's repudiation of an earlier confession to the crime for which defendant was charged. The testimony of other people to whom the witness had confessed was excluded on hearsay grounds. The Supreme Court found that Chambers had been denied the opportunity to present

valid evidence and that Chambers had been denied a fair trial.

In the present case, Steelman had every opportunity to present his case to the jury. Since Dr. White's testimony would have repeated the substance of Dr. Peale's, the trial court did not keep the jury from hearing testimony they had not otherwise heard. Furthermore, even though Steelman felt that it would be unwise to probe into the California incidents in cross-examining the psychiatrists who had examined him in connection with those charges, he still had an adequate opportunity to probe into the reasons for their opinions and "sift their consciences" enough to adequately assist the jury in making its own determination in regard to their credibility. *Chambers*, supra, 410 U.S. at 295, 93 S.Ct. at 1045–46, 35 L.Ed.2d at 308–09. We find no error.

## CONSTITUTIONALITY OF THE DEATH PENALTY

■ After the matter was submitted to this court for decision, the United States Supreme Court in *Lockett v. Ohio*, —— U.S. ——, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Bell v. Ohio*, —— U.S. ——, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), cast serious question on Arizona death penalty statutes. We have recently held in the case of *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253, (1978), that a person sentenced under our death penalty statutes and case law as it existed prior to *Lockett* and *Bell*, must be resentenced in light of the most recent United States Supreme Court decisions. We therefore remand the matter to the trial court for resentencing pursuant to *State v. Watson*, supra.

The verdicts and judgments of guilt are affirmed. The sentences other than the death penalty are affirmed, and the matter is remanded for resentencing on the two murder charges.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.