531 P.2d 531

**The STATE of Arizona, Appellee,**

v.

**Shawn JENSEN, Appellant.**

No. 2908.

Supreme Court of Arizona, In Banc.

Feb. 6, 1975.

Struckmeyer, V. C. J., did not participate in determination.

Gary K. Nelson, Former Atty. Gen., Bruce E. Babbitt, Atty. Gen. by Frank T. Galati, Asst. Atty. Gen., Phoenix, for appellee.

Shultz & Worischeck, P. A. by Charles C. Diettrich, Phoenix, for appellant.

CAMERON, Chief Justice.

This is an appeal from jury verdicts and judgments of guilt to the crimes of murder, first degree, A.R.S. §§ 13–451, 13–452 and 13–453, with sentences of life imprisonment on each charge, to run concurrently.

We are asked to determine three issues on appeal:

1. Was the defendant denied a fair trial by reason of the trial court's failure to instruct the jury as to the consequences of a verdict of not guilty by reason of insanity?

2. Did the taking of the defendant's rifle by the deputies amount to an "unlawful seizure" because of the lack of valid consent?

3. Did the State, through the Sheriff's Department or the Maricopa County Attorney's office, or both, plant agents in or near the defendant's cell for the purpose of gathering incriminating statements and evidence against him?

The defendant, Shawn Jensen, was tried by a jury and convicted of the murders of James Carl Burgoyne and Kathryn Ann Koger. The two young victims were shot to death in the desert near Saguaro Lake on 7 March 1973. James Carl Burgoyne had been shot five times—four times with a .22 caliber weapon and once with a .38. Kathy Koger was shot once with a .38 caliber weapon. Their bodies were "discovered" on 10 March 1973 by the defendant while walking in the desert with his wife.

During an interview weeks after he reported finding the bodies, Jensen gave police officers permission to test fire his .22 rifle. Ballistic tests indicated that the rifle had fired the shots which were removed from the body of James Carl Burgoyne. A .38 caliber Smith and Wesson pistol was later found in the possession of Dennis Lucas, an associate of the defendant. Tests showed it to be the gun that killed Kathy Koger. Testimony showed that Jensen had given the .38 to Dennis Lucas about two days after the discovery of the bodies.

After arrest the defendant was confined in the Maricopa County Jail. During the trial two of his cellmates testified for the State, presenting incriminating statements told them by the defendant. It was also established that both witnesses were known informants.

Prior to trial the defendant entered a plea of not guilty by reason of insanity.

## REFUSAL TO INSTRUCT THE JURY ON CONSEQUENCES OF INSANITY VERDICT

■ The defendant requested that the following instruction be given to the jury:

"If the defendant is found not guilty by reason of insanity, then, the trial court shall order the prosecutor to commence commitment proceedings against the defendant. A verdict of not guilty by reason of insanity means neither freedom nor punishment. It does mean the defendant, if his present mental condition justifies commitment to an appropriate mental institution, will be confined in a hospital for the mentally ill until he has recovered his sanity, and will not, in the future be dangerous to himself or others."

**410**

The court refused to give the instruction. The only instruction given regarding the consequences of the verdict was:

"In the event your verdict is that of murder in the first degree, it will be your duty to fix the punishment of the defendant of life imprisonment. In arriving at a verdict, you may not consider the possible punishment."

The defendant relies almost exclusively on an opinion of the Circuit Court of Appeals for the District of Columbia in which that court held that a jury has the right to know the meaning of the possible verdict of not guilty by reason of insanity as accurately as it knows by common knowledge the meaning of the other two possible verdicts. *Lyles v. United States*, 103 U.S. App.D.C. 22, 254 F.2d 725 (1957), cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), overruled on other grounds *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972). As pointed out in the Lyles dissent, however, the jury's common understanding of the other two verdicts (guilty and not guilty) is not always that accurate. Indeed, a jury can never know whether a sentencing judge will give the maximum sentence possible or a lesser one, or whether he will suspend imposition of sentence and grant probation. Even if the defendant is found not guilty, this does not preclude a civil commitment if warranted by the facts.

The jury had an obligation of finding the defendant guilty, not guilty or not guilty by reason of insanity. Because the defendant was charged with first degree murder, it had the responsibility under the statute in effect at that time to fix the punishment at life imprisonment. This was the limit of their responsibility. What happened after their verdict was not their concern.

We adhere to our previous statement in *State v. Peats*, 106 Ariz. 254, 475 P.2d 238 (1970) wherein the defendant requested that the jury be instructed as to the procedures to be followed in a criminal case upon acquittal by reason of insanity and as to the means of keeping a defendant under restraint pending a sanity hearing. In that opinion we said:

"We think the two proposed instructions tended to inform the jury concerning matters which were not properly their concern. It is the jury's duty to find the facts. In finding the facts, the jury should be guided by the evidence in the case and should not consider extraneous matters which might tend to influence their verdict independent of the facts surrounding the commission of the offense." *Peats, supra,* at 256, 475 P.2d at 240.

The trial court properly refused to give the defendant's requested instruction regarding the consequences of a verdict of not guilty by reason of insanity.

## WAS THE TAKING OF JENSEN'S RIFLE AN "UNLAWFUL SEIZURE"

On 2 April 1973 officers went to the jobsite where Shawn Jensen worked, picked him up in their automobile and took him to a Mesa sheriff's substation for an interview. After the interview, while driving Jensen back to his jobsite, the officers discussed the rifle which the defendant carried on a rack in his pickup truck. Jensen asked whether it was the law that he had to give up the weapon for testing. Detective Bray told him that it was not the law but that any honest citizen or innocent person would not mind having it tested. Jensen then said he would like to talk it over with his wife. The officers asked why. At this point, according to Jensen's testimony, Detective Lines told him they could take the gun anyway. Detective Lines denies this. Detective Lines further testified that although he considered Jensen a suspect when they left the Mesa substation, Lines did not tell Jensen that he had the right to refuse to give up the rifle:

"Q He was a suspect, wasn't he, at that time?

"DETECTIVE LINES: Yes, I would consider him a suspect at the time we left the substation, possible suspect.

"Q And knowing that he was a suspect in this offense, you did not advise him that he had the right to refuse to give that rifle to you?

"A As far as I was concerned, it was a voluntary situation.

"Q No, my question was, you did not advise him of that right?

"A No, he was not advised, specifically.

"Q Did you call his wife and check if it was all right to have the rifle before you took it?

"A No."

When they reached the jobsite, Jensen walked over to his pickup, took the gun, a .22 caliber Ruger semi-automatic rifle, out of the rack and handed it to the officers.

Test results indicated it was the gun that had shot James Carl Burgoyne. Based on these results an arrest warrant was issued for the defendant, Shawn Jensen, as well as a search warrant for his home.

■ Although there is testimony from the defendant himself indicating he was coerced into giving up the gun, Lines denied this and the trial court believed Detective Lines. The resolution of conflicts in testimony is a function of the trial court. Furthermore, both the defendant and the police officers agreed that the defendant was informed that it was not the law that he had to give up the gun. This court has consistently held where there is substantial evidence to support the finding of the trial court, we will not disturb that finding on appeal. State v. Denton, 101 Ariz. 455, 420 P.2d 930 (1966); State v. Sanders, 101 Ariz. 410, 420 P.2d 281 (1966), as cited in State v. Sherron, 105 Ariz. 277, 279, 463 P.2d 533, 535 (1970).

Appellant states, however, that even if the conflict in the testimony is resolved against the defendant, that consent was not proved by clear and positive evidence. We disagree and believe that the evidence was clear and positive that consent was given. This clear and positive evidence may come from an officer's testimony showing unequivocal conduct despite a direct conflict between his testimony and that of the appellant:

"* * * In the case at bar there was a direct conflict between the testimony of the officers and that of appellant on the question of consent; however, the testimony of the officers, which the trial court accepted as true, certainly was, 'clear and positive evidence in unequivocal words.' The fact that appellant readily gave a full confession certainly is conduct consistent with the giving of consent, particularly where the evidence of its voluntariness is so strong. (footnote omitted) The degree of affirmative assistance given to the police by the suspect is relevant in determining whether consent exists. * * *" State v. Sherrick, 98 Ariz. 46, 54–55, 402 P.2d 1, 7 (1965).

The United States Supreme Court has held that waivers of constitutional rights must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In the instant case the defendant had been cooperative from the beginning when he reported "discovering" the two bodies in the desert to the authorities. Consenting to a ballistics test of his rifle was not inconsistent with Jensen's prior behavior. We agree with the trial court that the consent was valid; the motion to suppress was properly denied.

DID THE STATE PLANT "AGENTS" IN THE DEFENDANT'S CELL FOR THE PURPOSE OF GATHERING INCRIMINATING STATEMENTS AND EVIDENCE AGAINST HIM?

■ The appellant claims that the State of Arizona, through the Maricopa County Sheriff's Department or the Maricopa County Attorney's office, or both, planted agents, Chester Galloway and Harry Gibbs, in his cell and next to his cell for the purpose of gathering incriminating statements and other evidence from the defendant.

The testimony of Galloway was extremely damaging to the defendant and provided the only evidence of a motive for the killings introduced at trial. Galloway, an inmate of the Arizona State Prison, had been transferred to the Maricopa County Jail for his own safety as a result of being a prison informant.

Our reading of the record simply does not support the defendant's allegation that there was an intentional plan by the State to surround him with informants.

The defendant relies on State v. Smith, 107 Ariz. 100, 482 P.2d 863 (1971) wherein we reversed the case and ordered it remanded for a new trial due to the conduct of the County Attorney in planting one of his known informers in a jail cell with the accused for the express purpose of obtaining information. For this service that informer was ultimately released. We held that the informer was a paid agent of the County Attorney—his payment being his freedom.

That is not the situation here. The evidence does not support the contention that Galloway and Gibbs were placed near the defendant for the purpose of informing on him, nor were they given instructions by the County Attorney to gather information. They were not agents of the State. They simply reported what Jensen freely volunteered to them. As we said in State v. Smith, supra:

"* * *. it should be emphasized that law enforcement officials have the right and indeed the obligation in the prosecution of crimes to use all information that comes into their hands pointing to the guilt of an accused. This is true even though the persons supplying that information may harbor expressed or unexpressed motives of expectation of lenient treatment in exchange for such information. It is only when the state actively enters into the picture to obtain the desired information in contravention of constitutionally protected rights that the sanction of inadmissibility becomes pertinent." State v. Smith, supra, at 103, 482 P.2d at 866.

Furthermore, as stated in the concurring opinion in State v. Smith, supra:

"The trend of the United States Supreme Court, both in denying certiorari in the case of Miller v. California, 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968) and in the opinion of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), would indicate an enlargement of the permissible usage of illegally obtained but trustworthy evidence as well as a contraction of the rule laid down in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)." State v. Smith, supra, at 105, 482 P.2d at 868.

In Miller v. California, 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968), the United States dismissed the writ of certiorari in a case in which an undercover agent of the State had spent almost a week in the defendant's cell gathering information without advising the defendant of her identity and purpose.

Also the United States Supreme Court has stated:

"Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374, 382 (1966), reh. denied 386 U.S. 940, 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967). See also State v. Stevenson, 104 Ariz. 313, 452 P.2d 106 (1969).

The appellant does not argue that he was coerced into talking to his cellmates so the Fifth Amendment privilege against self-incrimination was not violated. The testimony of the witnesses Galloway and Gibbs was properly allowed in the case before us.

Judgment and sentence affirmed.

HAYS, LOCKWOOD, and HOLOHAN, JJ., concur.

STRUCKMEYER, V. C. J., did not participate in the determination of this matter.