735 P.2d 781

**STATE of Arizona, Appellee,**

v.

**Shawn JENSEN, Appellant.**

**No. 2908–4.**

Supreme Court of Arizona, En Banc.

March 27, 1987.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee.

Victor Aronow, Phoenix, for appellant.

CAMERON, Justice.

On 27 February 1985, for the second time, a jury found the defendant, Shawn Jensen, guilty of two counts of first degree murder. Defendant was sentenced to two concurrent life sentences.[1] We have jurisdiction pursuant to Ariz.Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4035, and 17 A.R.S. Rules of Crim.Proc., Rule 32.9(c).

The issues that we must determine on appeal are

1) Whether the defendant was denied his 6th amendment right to confront witnesses against him;

2) Whether the burden-shifting instruction on the issue of malice constitutes fundamental error requiring reversal;

---

1. The imposition of the death penalty against the defendant was not possible because, at the time of the commission of the murders, Arizona's death penalty statute had been declared unconstitutional by the United States Supreme Court. *State v. Jensen*, 111 Ariz. 408, 410, 531 P.2d 531, 533 (1975).

3) Whether the trial court abused its discretion by refusing to permit surrebuttal testimony; and

4) Whether the trial court abused its discretion by precluding the use of an expert's videotape for illustrative purposes.

## FACTS

The facts concerning the shooting are not in dispute. On the morning of 7 March 1973, Kathy Koger and James Burgoyne informed their parents that, because they had made good grades on their final exams, they wanted to take the day off from school and take a drive. Burgoyne picked up Koger at her parent's house at approximately 8:15 a.m. Their parents did not expect Koger and Burgoyne home until after 5:30 p.m. that day.

Also on the morning of 7 March 1973, the defendant decided to take the day off work as a carpenter. Defendant dressed in his field jacket, his jungle boots, and his Levis, and left home carrying a .38 caliber Smith and Wesson revolver and a .22 caliber Ruger carbine. The weather was dark and overcast, and it had rained for a few days prior to 7 March 1973. The defendant testified at the second trial that this weather caused him to "regress" and fantasize about Vietnam. The defendant added that this "regression" was not a blackout, that he was able to drive a car and he understood both where he was and that he was leaving his house. The defendant drove to the Saguaro Lake area, where he left his car, taking his weapons. The defendant testified, "I had quite an amount of ammunition with me, and I made sure the weapons were loaded and I had a sandwich with me and the extra cartridges and rounds." The defendant said that the area around Saguaro Lake reminded him of Vietnam and that the foliage was "quiet foliage," meaning that it was permeated with moisture. The defendant testified that he had been out to the desert on several occasions and that on those occasions he had also allowed himself to recollect about Vietnam.

The defendant continued testifying that, as he moved through the desert, he could hear troop movement, the rustling of equipment and canteens, and the noise of fixed-wing aircraft flying overhead. As the defendant ascended a hill, he claimed he saw a regular from the North Vietnamese Army (NVA) stand up. The alleged NVA was dressed in khakis with a red star insignia. The defendant testified that when he "saw" this, he fired immediately and then, upon seeing another NVA, moved "tactically" into position. The defendant testified that

> we couldn't get any choppers in and I pulled out my revolver and shot them both at that time and moved on through that position ... I remember there was a vehicle on a road, and [it] didn't jive with the situation [of] shooting the two NVA regulars, and I felt the cylinder of my revolver ... and the cylinder was warm so I became concerned ... that I had fired the weapon and I checked the weapon and it was fired, so I reloaded the weapon, and that was the extent of the incident itself.

The defendant does not recall returning to his vehicle nor what he did while driving back to his house. The defendant only remembers arriving at his house. By 6:00 that evening, the parents of both Koger and Burgoyne became concerned and contacted the police.

On 10 March 1973, both families were informed that the bodies of Koger and Burgoyne had been found in an area near Saguaro Lake. The victims had been shot to death on 7 March 1973. Burgoyne had been shot five times: four times with a .22 caliber weapon and once with a .38 caliber weapon; three of these shots were to his head. Koger was shot once with a .38 caliber weapon; this shot was fired into the back of her head.

The "discovery" of the bodies had been reported to the authorities by the defendant. Rhonda Jensen, the wife of the defendant, testified that on 10 March 1973, the defendant was insistent that they go to the same desert area where he had been on 7 March 1973. While hiking in the area, the defendant told his wife that he smelled "something dead." Rhonda Jensen testi-

fied, however, that she could not detect any odor. The defendant then led Rhonda to the bodies of Koger and Burgoyne. The defendant and his wife then drove to the sheriff's substation at Saguaro Lake and reported what they had found. The defendant signed a voluntary statement which read as follows:

At 5:30 p.m. my wife and I arrived at this scene drove past a parked car went a little ways and stopped and started walking up a hill. Then I stopped and told my wife that I smelled something dead. As we had proceeded further we encountered the two victims. We then went and contacted the sheriff at Saguaro Lake.

Subsequently, the police regarded defendant as a suspect. Ballistics tests showed that the defendant's .38 caliber revolver and .22 caliber carbine fired the bullets which killed Koger and Burgoyne.

Defendant was convicted of two counts of first degree murder. Defendant was sentenced to two concurrent life sentences without possibility of parole. Defendant appealed. Both the convictions and the sentences were affirmed on appeal. *State v. Jensen*, 111 Ariz. 408, 531 P.2d 531 (1975).

In February of 1983, defendant petitioned the trial court for post-conviction relief pursuant to 17 A.R.S. Rules of Crim. Proc., Rule 32.1(e). The petition was granted on 17 February 1984 on the basis of newly-discovered evidence and a new trial was ordered. The new evidence was the classification by the American mental health community of Post Traumatic Stress Disorder (PTSD) as a diagnostic mental disorder. PTSD is a mental disorder afflicting some Vietnam War veterans. Defendant contended that if testimony with respect to PTSD had been presented to the jury in the original trial in 1973, the jury probably would have reached a different verdict. Defendant was able to present evidence at the new trial that he suffered from PTSD at the time he killed Koger and Burgoyne. Defendant was convicted again and again appeals.

## I. RIGHT TO CONFRONTATION

While awaiting trial in 1973, the defendant was held in the Maricopa County Jail. Chester Galloway, an inmate at the Arizona State Prison, had been transferred to the Maricopa County Jail for his own safety as a result of his being a prison informant. Upon his transfer, Galloway was placed in the same cell as the defendant. Galloway later informed county jail authorities that the defendant had told him details of the murders of Koger and Burgoyne.

Galloway was called as a witness by the prosecution in defendant's first trial. Galloway's incriminating and damaging testimony came in on direct examination by the prosecution. Galloway was cross-examined by Charles Dietrich, the defendant's attorney.

At the defendant's second trial, the prosecution again subpoenaed Galloway who, by that time, was in prison in California. Galloway refused to testify a second time against the defendant. The prosecution, in a pre-trial motion, sought to have Galloway declared unavailable pursuant to the Arizona Rules of Evidence, Rule 804(a)(2), so that Galloway's testimony could be introduced into evidence by the prosecution. The prosecution, as part of its offer of proof, placed Galloway on the witness stand. In response to questioning by the prosecutor, Galloway testified:

Q. Were you subpoenaed to testify in this matter?

A. Yes.

Q. Will you testify?

A. No, sir. I will not. If the Court wishes to enforce punishment on me for this, that is fine, but I will not testify in this trial.

Q. Are you aware that the Court can hold you in contempt for not testifying?

A. I realize that, sir. Like I said, I'm sorry. I hope it's not done that way, but if it is, there's nothing I can do. I will accept it.

Q. Are you persistent in your refusal to testify?

A. Yes, sir, I am.

\*　　\*　　\*　　\*　　\*　　\*

Q. Why won't you testify?

A. I got various reasons. One, I was wrong to start with for ever testifying against Shawn. It took me awhile to realize that, but I realize I was and I am sorry I did. He pulled 12 years, and I think 12 years is enough for any man, especially in a hellhole like Florence State Penitentiary.

\*　　\*　　\*　　\*　　\*　　\*

Q. If the Court punishes you, you will still not testify?

A. That is right, sir.

Galloway further testified that he feared that other inmates would take retaliatory action against him if he appeared in the second trial.

In response to defendant's attorney's questions upon cross-examination, Galloway answered:

Q. [Y]ou won't testify about the same matters that you testified in the original trial; is that correct?

A. Anything that is in the transcript that I testified to the first time, I know I will not testify to any part of it.

\*　　\*　　\*　　\*　　\*　　\*

Q. Would you be willing to explain to a jury the reasons you won't testify?

A. I just explained in the courtroom. I am not explaining to anybody anymore. I explained this time. My understanding that I would be brought here without exposure, that I would testify before it, the judge, in this courtroom, as far as any of the rest of it, I cannot.

The trial judge found Galloway unavailable and the prior testimony admissible, pursuant to the Arizona Rules of Evidence, which states:

**Rule 804. Hearsay Exceptions; Declarant Unavailable**

**(a) Definition of unavailability.** "Unavailability as a witness" includes situations in which the declarant—

\*　　\*　　\*　　\*　　\*　　\*

(2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; or

\*　　\*　　\*　　\*　　\*　　\*

**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as witness at another hearing of the same or a different proceeding, ... if the party against whom the testimony is now offered, ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Rule 804(a)(2) and (b)(1), Arizona Rules of Evidence, 17A A.R.S.

■ It is apparent that the admission of the testimony was allowable under this provision of the Arizona Rules of Evidence. The witness had made himself unavailable as described by Rule 804(a)(2) and the former testimony was under oath subjected to cross-examination by defendant in a similar proceeding as required by Rule 804(b)(1).

■ The defendant contends, however, that this ruling violated his right to confront witnesses against him under both the sixth amendment to the United States Constitution, as made applicable to the states through the due process clause of the fourteenth amendment to the United States Constitution, and article 2, section 24 of the Arizona Constitution ("the accused shall have the right to ... meet the witnesses against him face to face, to have compulsory process to compel the attendance of witnesses in his own behalf...."). We do not agree.

The sixth amendment's confrontation clause provides:

In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....

**176**

An exception to the confrontation clause exists where the witness is unavailable but previously has testified at a judicial proceeding, subject to cross-examination, against the same defendant. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *State v. Schad*, 129 Ariz. 557, 569, 633 P.2d 366, 378 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). Admittedly, the prior testimony must bear sufficient "indicia of reliability". *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597, 607–08 (1980); *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301 (1972); *State v. Yslas*, 139 Ariz. 60, 65, 676 P.2d 1118, 1123 (1984).

> The exception to the confrontation clause is based, rather, upon the view that recognized hearsay exceptions have sufficient "indicia of reliability" so that their use does not offend the clause even though the witness is not produced for confrontation.

*State v. Martin*, 139 Ariz. 466, 478, 679 P.2d 489, 501 (1984).

Galloway's original testimony in 1973 was given while under oath, in the adversary proceeding of the defendant's first trial, and was subjected to full and effective cross-examination by the defendant's attorney. There were the "indicia of reliability" required by the United States Supreme Court. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). We find no error.

■ The defendant further asserts, however, that his constitutional rights were violated because the trial court refused his request that Galloway be seated in the courtroom at the witness stand, or in close proximity to it, during the reading of his 1973 testimony. It is noted that the defendant did ask to have the court compel Galloway to take the stand and refuse to testify. We do not agree with defendant's position. The motion that was made was addressed to the sound discretion of the trial judge and we find no abuse of discretion in denying the defendant's request.

## II. BURDEN–SHIFTING INSTRUCTION ON MALICE

■ At the second trial, the trial judge gave the following instruction on the issue of malice as applied to murder:

> Where it is shown that the homicide has been committed with a deadly weapon, and no circumstances in mitigation, justification or excuse appear, the law implies malice.

This instruction, as well as the rest of the instructions given to the jury, was substantially similar to the instruction given at the original trial in 1975. Neither the prosecution nor the defense attorneys objected to this instruction.

On appeal, however, the defendant contends that this instruction on malice is burden-shifting and violates the due process of law rights guaranteed by the fourteenth amendment to the United States Constitution. We agree.

■ The due process clause places the burden on the prosecution to prove beyond a reasonable doubt every element of a criminal offense. *In re Winship*, 397 U.S. 358, 365, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375–76 (1970). Where intent is an element of the crime charged, the question of intent "cannot be taken from the trier of fact through reliance on a legal presumption." *United States v. United States Gypsum Co.*, 438 U.S. 422, 435, 98 S.Ct. 2864, 2872, 57 L.Ed.2d 854, 868 (1978). "And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not ... justify shifting the burden to him." *Mullaney v. Wilbur*, 421 U.S. 684, 702, 95 S.Ct. 1881, 1891, 44 L.Ed.2d 508, 521 (1975). An instruction creating a presumption of malice that has the effect of shifting the burden of proof on intent to the defendant violates due process. *Sandstrom v. Montana*, 442 U.S. 510, 523–34, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39, 50–51 (1979). The error is fundamental and may be raised on appeal even if not raised in the trial court. *State v. Correll*, 148 Ariz. 468, 473, 715 P.2d 721, 726 (1986).

In this case, as the prosecution concedes, the instruction was improper as it could cause a reasonable juror to perceive that the burden of proof for the element of malice shifted from the prosecution to the defendant. The prosecution contends, however, that the instruction was harmless error. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709 (1967). "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986). We agree.

In a similar case, the defendant was charged under Tennessee law with the murder of two persons arising out of the same incident. *Rose v. Clark,* ——— U.S. ———, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). The defendant shot to death his former girlfriend and her boyfriend while the two were sitting in the boyfriend's pick-up truck. The defendant in his vehicle had followed the pair for about one hour; then the victims pulled into a driveway. The defendant followed, blocking their escape. The shootings were witnessed by the former girlfriend's two children, ages 6 and 3, who were also in the pickup. The defendant alleged, as one of his defenses, that he was either insane, or incapable of forming the requisite intent, to kill his two victims.

The trial court instructed the jury on both first degree murder (in Tennessee, this requires proof of deliberation and premeditation) and second degree murder (Tennessee law requires proof of malice, but not of planning and premeditation):

> All homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption. Thus, if the State has proven beyond a reasonable ... doubt that a killing has occurred, then it is presumed that the killing was done maliciously. But this presumption may be rebutted by either direct or circumstantial evidence, or by both, regardless of whether the same be offered by the Defendant, or exists in the evidence of the State.

*Id.* at ———, 106 S.Ct. at 3104, 92 L.Ed.2d at 468 (citations omitted). The trial court additionally instructed the jury that

> The question of ... malice is for you to determine from the entire case, and you should look to all the facts and circumstances developed by the evidence to determine whether the State has.... proven beyond a reasonable doubt the existence of malice. If you have a reasonable doubt ... you must acquit him [the defendant] of that offense [second degree murder].

*Id.* at ——— n. 2, 106 S.Ct. at 3104 n. 2, 92 L.Ed.2d at 468 n. 2.

The Supreme Court in *Rose, supra,* held that the harmless error standard of *Chapman v. California* applies to an instruction that impermissibly shifts the burden of proof on malice. *Rose,* ——— U.S. at ———, ———, 106 S.Ct. at 3107, 3108, 92 L.Ed.2d at 471, 472. The Court reasoned that the impermissible instruction error was "not 'so basic to a fair trial' that it can never be harmless." *Id.* at ———, 106 S.Ct. at 3107, 92 L.Ed.2d at 472, *quoting Chapman,* 386 U.S. at 23, 87 S.Ct. at 828, 17 L.Ed.2d at 710.

In order that the application of the harmless error analysis does not denigrate the constitutional rights afforded in criminal trials, the Court emphasized that certain rights must be protected for the criminal trial to reliably serve its "function as a vehicle for determination of guilt or innocence." *Id.* ——— U.S. at ——— - ———, 106 S.Ct. at 3105–06, 92 L.Ed.2d at 469–71. These basic protected rights include trial before an impartial judge, counsel, cross-examination, and an unbiased jury. *Id.* Without these, no criminal punishment may be regarded as fundamentally fair. *Id.* at ———, 106 S.Ct. at 3106, 92 L.Ed.2d at 470. After concluding that these rights were protected in *Rose,* the Court specially noted: "Apart from the challenged malice instruction, the jury in this case was instructed that it had to find respondent guilty beyond a reasonable doubt as to every element of both first- and second-degree murder." ——— U.S. at ———, 106 S.Ct. at 3107,

92 L.Ed.2d at 471. The Court stated that "[p]laced in context, the erroneous malice instruction does not compare with the kinds of errors that automatically require reversal of an otherwise valid conviction." *Id.* Thus, where the reviewing court finds that the trial record establishes guilt beyond a reasonable doubt, "the interest in fairness has been satisfied and the judgment should be affirmed." *Id.*

■ In the instant case, the basic protected rights enumerated in *Rose, supra,* were protected. As to the burden of proof, the trial court repeatedly emphasized to the jury that the prosecution had the burden of proving the defendant guilty beyond a reasonable doubt:

> I will now tell you the rules you must follow to decide this case.
>
> \* \* \* \* \* \*
>
> The law does not require a defendant to prove his innocence. He is presumed by law to be innocent. This means the State must prove all of its case against the defendant.
>
> The State must prove the defendant guilty beyond a reasonable doubt. Reasonable doubt means doubt based upon reason. It is not imaginary or possible doubt. It is a doubt for which a reason can be given, arising out of an impartial consideration of the evidence or lack of evidence.
>
> \* \* \* \* \* \*
>
> The defendant's pleas of not guilty and not guilty by reason of insanity put into issue every material allegation in the indictment and place the burden of proof beyond a reasonable doubt upon the State.
>
> \* \* \* \* \* \*
>
> As between the degrees of murder, if you entertain a reasonable doubt, then you should resolve that doubt in favor of the defendant, and in favor of the lesser degree, which would be murder of the second degree.
>
> \* \* \* \* \* \*
>
> You are instructed that there is a presumption that persons are sane and ordinarily in a criminal case prosecution may rely on this presumption. However, the defendant may raise the issue of insanity in his defense, and when he does so, it is the State's burden to establish beyond a reasonable doubt that the defendant was legally sane.

The issue of defendant's sanity was properly defined by the instructions and the state had the burden of showing that the defendant was sane beyond a reasonable doubt. The jury found by its verdict that the defendant was sane at the time of the shooting. There was then no question that there might be a lack of malice based upon defendant's insanity. Under these conditions and reviewing the evidence produced at trial, we find that both malice and defendant's guilt were overwhelmingly supported by the evidence. The erroneous malice instruction was, therefore, harmless beyond a reasonable doubt. *Chapman, supra, Rose, supra.*

## III. SURREBUTTAL TESTIMONY

After the state's case-in-chief, the defense presented evidence focusing primarily on defendant's post-Vietnam War behavior and his alleged symptoms of PTSD. The prosecution, to rebut the defense of PTSD, presented testimony concerning defendant's behavior both post- and pre-Vietnam War. Thereafter, the defense wanted to offer surrebuttal testimony in order to impeach the prosecution's rebuttal witnesses who had testified as to defendant's pre-Vietnam War behavior. The trial court refused this request.

The defendant's case-in-chief consisted primarily of evidence of defendant's life and behavior after the Vietnam War. The defense called as witnesses medical experts in the area of psychology and PTSD, as well as several individuals who testified as to how defendant acted since returning home from the Vietnam War. The defendant's wife testified about defendant's behavior both before and during their marriage, all of which occurred after defendant's return from Vietnam. Finally, the defendant testified in his own behalf.

In rebuttal to the defense of PTSD, the prosecution presented three psychiatrists who testified that the defendant was a sociopath who knew the nature and quality of his acts when he killed Koger and Burgoyne and who, at that time, was not suffering from any symptoms of PTSD. The three psychiatrists, Drs. Michael Wise, Robin Henderson, and Meier Tuchler, made their diagnoses based upon several personal interviews with the defendant, defendant's school and military records, criminal record, medical and combat records, and transcripts and interviews from defendant's previous court proceedings.

The prosecution also had the defendant's foster mother, Doris Rentscheler, testify on rebuttal to buttress the foundation of the testimony of the experts. Ms. Rentscheler stated that there was no difference in the defendant's pre- and post-Vietnam behavior. Ms. Rentscheler added that both before and after Vietnam, the defendant had lied and had stolen from his foster parents, that he had never suffered from any trances or flashbacks, that he was able to sleep, that he appeared to know where he was and what he was doing, and that he knew right from wrong.

After the prosecution's rebuttal, the defendant sought to have four witnesses testify in order to impeach the credibility of Ms. Rentscheler's testimony about defendant's pre-Vietnam War behavior. The defendant reasoned that because the three prosecution psychiatrists had, in part, relied on information supplied to them by Ms. Rentscheler in making their diagnoses of the defendant, if Ms. Rentscheler could be impeached, then the diagnoses would be undermined. The defendant then made an offer of proof.

The trial judge refused to allow this surrebuttal evidence on several grounds, which he stated during an *in chambers* proceeding. In the courtroom, the trial judge formally placed into the record the reasons denying the surrebuttal testimony: They are as follows: the issues are that you intend to provide through surrebuttal testimony, which I previously stated are more than satisfactorily set forth in the record, ... the jury ... [can] ... very capably evaluate them and make a decision.

[T]he *second* issue ... is cumulative, the matters that you proffered at this juncture for rebuttal, the Court believes are cumulative and unnecessary to any fair and proper determinations of the issues herein.

*Third* basis upon which I make the ruling is the fact that the Court believes that those proffered items have little or no probative value in this matter

\*　　\*　　\*　　\*　　\*　　\*

The ... *fourth* basis ... is that the items are not proper ... surrebuttal ... They are outside the scope of any rebuttal that was offered. And in some instances raise new issues that were not in the rebuttal portion of this proceeding.

\*　　\*　　\*　　\*　　\*　　\*

A *fifth* basis is the relevancy and the materiality as they are basically impeachment items or impeachment efforts undertaken which are centered on collateral issues.

\*　　\*　　\*　　\*　　\*　　\*

It doesn't speak to any issue on which there is not sufficient evidence in the record now or which is relevant.

The next item is number *six* ... and that is that one of the witnesses ... has testified before in this matter ... in the defendant's case, and the testimony that is proffered [here] in the offer of proof is ... cumulative and/or consistent in other instances with that evidence which he presented in his presentation.

And the Court believes that ... that proffered testimony ... is not ... appropriate ... for ... surrebuttal, ... it could have been given, and there was no reason why it shouldn't have been given at the time that Mr. [David] Rentscheler [defendant's foster brother] testified originally, called by the defense.

\*　　\*　　\*　　\*　　\*　　\*

The proffered surrebuttal is, as I stated, denied.

(emphasis added).

■ The standard of review in Arizona for the grant or denial of surrebuttal evidence by a trial court is set forth in *State v. Steelman*, 120 Ariz. 301, 319, 585 P.2d 1213, 1231 (1978). The decision whether to allow or to deny admission of many types of surrebuttal testimony is within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of that discretion. *Id.* The importance and purpose of surrebuttal testimony was explained in *Steelman:*

> Surrebuttal testimony is usually offered to explain away new evidence brought out in the rebuttal presentation or to impeach the testimony presented in rebuttal. Only in rare cases will it be error for the trial court to refuse to admit the testimony.

120 Ariz. at 319, 585 P.2d at 1231 (citation omitted).

■ In the instant case, the prosecution presented the testimony of three psychiatrists and the defendant's foster mother to rebut the defendant's claim of PTSD. The witnesses defendant wanted to call on surrebuttal were not going to give testimony impeaching or attacking the credibility of the prosecution's witnesses. Instead, the testimony appeared to be merely cumulative to that which the defendant had put forth in his case-in-chief. The trial court was not required to grant defendant's request for this type of surrebuttal testimony. We find no abuse of the trial court's discretion.

## IV. THE EXPERT'S VIDEOTAPE

The defendant sought to have admitted into evidence a sixteen-minute-long film that one of its expert witnesses wanted to use to explain PTSD to the jury. The defendant wanted to use the film only for illustrative purposes in accordance with the Rules of Evidence, which read:

> **Hearsay Exceptions; Availability of Declarant Immaterial.** The following are not excluded by the hearsay rule,

even though the declarant is available as a witness: * * *

> **(18) Learned Treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon him in direct examination, statements contained in published treatises ... on a subject of ... medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Arizona Rules of Evid., Rule 803(18), 17A A.R.S.

The film was made under a contract between the Disabled American Veterans and the Image House in Dallas, Texas. The film, entitled "The Symptomology of PTSD", was made for Dr. John F. Yost, a defense expert witness who used it for his group presentations.

The trial judge conducted an *in-chambers* proceeding to determine the admissibility of the film, as requested by the defendant, and viewed the film. During this proceeding, Dr. Yost was sworn-in, gave his testimony, and he was cross-examined. Upon direct examination by the defendant's attorney, Dr. Yost testified about the film:

> The tape attempts to show graphically, audio visually some of the symptoms of post traumatic stress disorder as presented by real veterans who are interviewed individually and in groups, and particular to focus on some of the symptoms of the medical personnel of Viet Nam ...
>
> * * * * * *
>
> I was asked to be part of a panel in 1981 to present for the first time at the National Organization of Psychiatrists something about my work and experiences and diagnosis of symptoms of [PTSD]. Unfortunately, I had approximately 20 minutes to do that and I didn't think I could do that in 20 minutes from any prepared, written material to large audience of psychiatrists so I got together with Image House in Dallas and had lots of film footage from a variety of programs dealing with [PTSD] and we

had some video tape material of groups and individual veterans that we interviewed, asked them to put it together in a particular format to last about 18 to 20 minutes and this was the end result of that.

\* \* \* \* \* \*

There also are initially some scenes, new scenes from World War I, World War II, Korean and Viet Nam, in order to contrast what we call the differences in terms of the kind of warfare ... the major differences between the wars and why PTSD might be more prevelant amongst Viet Nam veterans.

Upon cross-examination by the prosecution, Dr. Yost admitted that he was able to testify about the symptoms of PTSD and dissociative-like states without the aid of the film. After Dr. Yost's testimony, the judge concluded:

> THE COURT: I guess the real question I have is how much of the tape the Doctor has actually involved himself in as far as the—in interviews, the researching of material involved in it, the verification of the statements by the different persons, I won't say men, but persons who served, who claimed to have served in Viet Nam, validating their service.
>
> THE WITNESS [DR. YOST]: This was not done by me.

The judge disallowed the use of the film because it lacked both foundation and authentication. The trial judge also ruled that the film contained "a significant amount of hearsay" that could not "be verified by the Doctor" and, at its best, the film "would be hearsay on hearsay in most parts of it." The trial judge further commented that the film would not be admissible under either 17A A.R.S. Rules of Evid., Rule 803(18) or Rule 803(24) ("other exceptions").

The relevance and admissibility of evidence is determined by the trial court, whose reasonable exercise of such discretion will not be disturbed on appeal unless there has been a clear abuse of such discretion. *State v. Adamson*, 136 Ariz. 250, 259, 665 P.2d 972, 981, *cert. denied*, 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178

(1983). Arizona caselaw is sparse concerning the degree of discretion exercised by a trial court in admitting or denying "learned treatises" under Rule 803(18) in a criminal trial. Many cases concerning Rule 803(18), however, discuss the application of the rule to medical testimony proffered in a personal injury or tort case. *Rossell v. Volkswagen of America*, 147 Ariz. 160, 172–73, 709 P.2d 517, 529–30 (1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986) (no abuse of trial court discretion when charts detailing effects of carbon monoxide levels on humans were allowed for illustrative purposes only). *See also Sharman v. Skaggs Cos., Inc.*, 124 Ariz. 165, 169, 602 P.2d 833, 837 (App.1979) (unpublished medical report by defendant's expert witness not admissible under learned treatise exception to hearsay rule).

We believe that the learned treatise analyses contained in the above cases apply to the instant criminal case where the learned treatise, as well as the testimony, are medical in nature.

 We do not believe, however, that the trial court abused its discretion in not admitting this evidence. The trial judge is in the best position to determine the relevancy of evidence because he has seen the entire presentation of the case. *Adamson*, 136 Ariz. at 260, 665 P.2d at 982. The trial judge determines the degree of probative value of evidence offered under Rule 803(18) in order to exclude evidence which is only of slight probative value. *Chapman v. Levi-Strauss*, 145 Ariz. 411, 413, 701 P.2d 1219, 1221 (App.1985) (denial of statistical summaries of burn injuries from textiles based on cumulative evidence and waste of time). The trial judge also determines if evidence offered under the learned treatise exception to the hearsay rule, when presented with the testimony of an expert, is of "a source that experts could rely upon in forming their opinions." *Schneider v. Cessna Aircraft Co.*, 150 Ariz. 153, 161, 722 P.2d 321, 329 (App. 1985). In the instant case, the trial judge properly enunciated his reasons for refusing to admit the film.

We have reviewed the record for fundamental error. A.R.S. § 13–4035; *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We have found none.

The judgments, convictions, and sentences are affirmed.

GORDON, C.J., FELDMAN, V.C.J., HOLOHAN, J., concur.

MOELLER, J., did not participate in the determination of this matter.