999 P.2d 192

**STATE of Arizona, Appellee,**

v.

**Audra Jean TALMADGE, Appellant.**

**No. CR–98–0312–PR.**

Supreme Court of Arizona,
En Banc.

May 5, 2000.

Janet Napolitano, Attorney General, Phoenix, by Paul J. McMurdie, Chief Counsel Criminal Appeals Section, Donna J. Lam, Assistant Attorney General, Tucson, Attorneys for Appellee.

Susan A. Kettlewell, Pima County Public Defender, Tucson, by Rebecca A. McLean, Assistant Public Defender, Attorneys for Appellant.

## O P I N I O N

JONES, Vice Chief Justice.

¶ 1 In this case, we review evidentiary rulings that prevented two persons from testifying as expert witnesses on behalf of a defendant charged with eleven counts of criminal child abuse. We conclude, as to one of the experts, Dr. Paterson, that the court's ruling amounted to an abuse of discretion. By excluding both, the court prevented the defendant from presenting potentially sufficient evidence of the only defense raised. Nothing in the record suggests the proferred defense was trivial or frivolous. We thus remand for a new trial. Jurisdiction is predicated on Rule 31.19, Arizona Rules of Criminal Procedure, and article VI, section 5(3) of our state constitution.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Medical doctors discovered and treated several broken bones of the defendant Audra Talmadge's three-month-old daughter. Finding the broken bones consistent with what they thought may be child abuse, the doctors reported the defendant to state authorities. The child was placed in foster care, and the defendant was charged with two counts of class 2 child abuse (likely to produce death or serious injury in a victim under fifteen) and nine counts of class 4 child abuse (non-death, serious injury).

¶ 3 The defendant asserted that abuse was not involved and that the fractures were the result of temporary brittle bone disease ("TBBD"), a controversial cousin to the well-known and more accepted bone disease known as osteogenesis imperfecta. This was defendant's exclusive defense, and to support it she sought to have Dr. Marvin Miller testify as her principal TBBD expert. Miller works as a pediatric geneticist in Dayton, Ohio and is regarded as one of the nation's premiere experts with respect to TBBD.

¶ 4 Miller could not come in person but instead offered to testify via videotape or through some other electronic means. The trial court issued an out-of-state subpoena to compel Miller's attendance. Through counsel, Miller resisted enforcement of the subpoena in the Ohio courts, arguing that his attendance at the trial in Arizona would create an occupational hardship. The Ohio court refused to enforce the Arizona subpoena.

¶ 5 On February 8, 1996, the trial court granted defendant's motion to take Miller's videotaped deposition in lieu of live testimony, finding Miller to be a material and unavailable witness under Rule 15.3 of the Arizona Rules of Criminal Procedure. Five dates were submitted to the prosecutor as to when the deposition could be taken, three of which conflicted with the prosecutor's responsibility for a different trial. The prosecutor and defendant's counsel settled on March 14. A day later, the prosecutor sought to change the date to March 12, after remembering a family matter that prevented attendance on March 14.

¶ 6 The defendant was unable to agree to the prosecutor's proposed change and urged the prosecutor to take up the scheduling matter with the judge. Instead of addressing the scheduling issue, however, the State went on the offensive, responding with a motion challenging Miller's testimony as lacking "general acceptance" within the scientific community and asking for a hearing under principles enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).[1]

¶ 7 On March 29, 1996, the trial court denied the State's *Frye* request, but after reviewing more than 600 pages of *Frye* material submitted by the State and the defendant regarding TBBD and Miller's qualifications, and after conducting its own research, the trial court reversed its earlier Rule 15.3 ruling that would have allowed Miller's videotaped deposition to be taken. The trial court explained its ruling:

> [S]ometimes he [Miller] looks real good and sometimes he looks real bad. The jury needs to see him. We cannot do it by having him all cleaned up on a video, with no objections and no anything, and have other doctors live in court. It's been a long time since you tried to get him here in December. I'm not going to put blame now, but there was [sic] scheduling difficulties and things that weren't done toward the end of the year, and I'd like for you to attempt to bring Dr. Miller here now. It's been months since he's testified anywhere.

He has a reputation to defend. I would ask you to challenge him with that. The reason why I will allow the jury to hear this [testimony regarding TBBD] and to assess it themselves is so they can hear all that there is to hear, and it's in both your clients' interest[s] that your witness be live, and it's also the State's right, I think, to have your witness subject to the same kind of credibility test as their experts.

Unable to convince Miller to reconsider his decision not to testify in person, which seemed an obvious outcome in view of Miller's prior efforts to quash the Arizona subpoena, defendant was left with no alternative but to select a different TBBD expert.

¶ 8 On April 15, 1996, defense counsel indicated Dr. Colin Paterson of Scotland as a possible expert. He is arguably the world's preeminent TBBD expert, and Miller emulates his work. Paterson had not been officially disclosed as a potential witness before this time, but his work was at the heart of the *Frye* debate and was the subject of prior discussions between counsel about TBBD. Defense counsel believed the cost of Paterson's attendance might have been excessive, however, and mentioned that other potential witnesses may have to be contacted. With trial scheduled for June 18, the judge ordered disclosure of Miller's replacement by April 29. On that date, defense counsel disclosed Dr. Richard Roberts, who, in his career, had diagnosed only one TBBD patient and clearly lacked the experience and credentials of either Miller or Paterson.

¶ 9 On June 7, defense counsel disclosed Paterson as a surrebuttal witness, explaining that Paterson had made unexpected plans to be in the United States for reasons unrelated to the trial and would be willing to testify in Arizona as part of that trip. However, Paterson would be available only June 28, a fact that defense counsel apparently did not disclose until June 17, the day before trial.

¶ 10 After learning that Paterson would be available only June 28, the State moved to exclude the entirety of Paterson's testimony as a sanction for late disclosure. The trial

1. The record is not clear whether the State planned to file the *Frye* motion before the conflict over Miller's deposition date arose or if

instead it was done as a reaction to the contentious atmosphere then existing between counsel. We sense the latter.

court granted this motion. After a two-week trial at which Dr. Roberts testified, defendant was found guilty on all charges and was given two consecutive seventeen-year sentences for the class 2 felonies and nine concurrent four-year terms of probation for the class 4 charges, to be served consecutively to the class 2 sentences. On appeal, the court of appeals affirmed the convictions and sentences.

¶ 11 We granted review to evaluate three rulings by the trial court: (1) exclusion of Miller's videotaped deposition after first ruling the deposition admissible, (2) the preclusion of Paterson's testimony, and (3) the ruling that would not allow Roberts to mention Miller's conclusions, contained in a letter, with respect to the cause of broken bones in defendant's infant daughter.[2] Because we now conclude the first two are dispositive, we do not reach the third.[3]

## DISCUSSION

### Miller's videotaped deposition

¶ 12 We review for abuse of discretion the trial court's Rule 15.3 ruling precluding Miller's videotaped deposition and requiring live testimony. *See State v. Fuller,* 143 Ariz. 571, 574, 694 P.2d 1185, 1188 (1985); *State v. Reid,* 114 Ariz. 16, 29, 559 P.2d 136, 149 (1976).

¶ 13 The basis of the court's initial decision to allow the videotape was that Miller was a material and unavailable witness under the rule. The only event that occurred between that ruling and the subsequent ruling which prevented videotaping was the State's *Frye* challenge. Yet the trial court refused the State's request to hold a *Frye* hearing, and Miller was just as material and unavailable after the challenge as before.

¶ 14 The record is not entirely clear why the trial court reversed itself, but a common sense rationale seems reasonable. In *State v. Brady,* we stated a clear preference for live testimony in a manner that suggests having live witnesses is the most advantageous way to proceed: "The live testimony of the proposed witness as opposed to the written interrogatories could have been the difference between conviction and acquittal." 122 Ariz. 228, 230, 594 P.2d 94, 96 (1979). We ordered a new trial in *Brady* because the defendant was forced to settle for interrogatory answers instead of live testimony as a result of the trial court's unwillingness to subpoena an out-of-state witness.[4]

¶ 15 In the instant case, unlike *Brady,* the question for the trial judge was whether to allow a videotaped deposition in lieu of live testimony. The judge ordered the live testimony simply out of concern that Miller would be "all cleaned up on a video" and that this would deprive the jury of a live appearance, deemed preferential, if not essential, on the facts of this particular case.

¶ 16 Accordingly, while the trial court's seemingly abrupt reversal of position on Mil-

---

2. Miller had not examined defendant's daughter in person. Instead, Xrays and other various medical information had been sent to him. Review of these materials formed the basis of Miller's conclusions as to what caused the broken bones.

3. The trial court's evidentiary ruling that prevented reference by Dr. Roberts to Dr. Miller's conclusions warrants a word of caution. While we do not opine on this issue, we nevertheless cite our opinion in *State v. Lundstrom,* 161 Ariz. 141, 147, 776 P.2d 1067, 1073 (1989), indicating that "[a] testifying expert may rely on the opinions of other experts if such reliance is *'the kind of material on which experts in the field base their opinions.' Lewis v. Rego,* 757 F.2d 66, 74 (3d Cir.1985)." The opinion of a non-testifying expert may be disclosed to the trier of fact only if it serves as the basis of the opinion of the testifying expert and may not be disclosed merely to prove

the truth of the matter asserted. *Lundstrom,* 161 Ariz. at 148, 776 P.2d at 1068 (emphasis added).

4. Because the trial court did issue an out-of-state subpoena seeking to compel Miller's attendance, unlike *Brady,* the grounds for a new trial in this case are not the same as those in *Brady.* We mention *Brady* here only to point out the *Brady* rationale—that live testimony is preferential.

Defendant also challenges the videotaped deposition ruling under federal and Arizona compulsory process guarantee provisions. *See* U.S. Const. amend. VI; Ariz. Const. art. II, § 24. But Miller, in the instant case, received the process found lacking in *Brady*—the issuance of an out-of-state subpoena. Defendant further argues that arbitrary application of Rule 15.3 similarly implicates compulsory process guarantees. Because we decide this case under an abuse of discretion standard, we do not reach the compulsory process challenge.

ler raises a question even under our deferential standard for abuse of discretion, the question is not substantial, and we hold that the trial court's reversal was not an abuse.

### Paterson's exclusion

■ ¶ 17   We have held that precluding a witness entirely should be a sanction of last resort. *See State v. Tucker*, 157 Ariz. 433, 440, 759 P.2d 579, 586 (1988). Dr. Paterson's exclusion must be examined under the legal standard applied to surrebuttal witnesses because the disclosure of Paterson on June 7, 1996 was in that capacity rather than as the primary defense expert on TBBD.[5] We first addressed the issue of admissibility of surrebuttal evidence in *State v. Steelman*, 120 Ariz. 301, 585 P.2d 1213 (1978). Rebuttal evidence is within the sound discretion of the trial court, and its exclusion is reviewed for abuse of discretion. Additionally, this court stated, "the discretion of the trial court in allowing surrebuttal testimony is even greater." *Id.* at 319, 585 P.2d at 1231.

■ ¶ 18   Surrebuttal testimony may be offered to introduce evidence in response to new rebuttal testimony or to impeach rebuttal testimony and must be more than cumulative. *See id.* at 319–20, 585 P.2d at 1231–32. "Only in rare cases will it be error for the trial court to refuse to admit the testimony." *Id.* at 319, 585 P.2d at 1231.

■ ¶ 19   Evidence that is merely cumulative is generally held inadmissible when proferred as surrebuttal testimony. *See State v. Jensen*, 153 Ariz. 171, 179, 735 P.2d 781, 789 (1987) (surrebuttal testimony inadmissible as "cumulative and unnecessary to any fair and proper determination[s] of the issues"). Paterson's testimony, on the other hand, would have been more than cumulative. It was also corroborative in that it "went to the heart of appellants' defense." *State v. Kennedy*, 122 Ariz. 22, 27, 592 P.2d 1288, 1293 (1979).

¶ 20   Moreover, Paterson's testimony was intended to impeach Erickson, something he was capable of doing based in part on his vast experience in defining and diagnosing TBBD. Paterson has diagnosed in excess of 800 cases. Roberts, having diagnosed only one case, was incapable of the depth of analysis that Paterson's superior experience would afford. With Roberts' limited testimony, the defendant was left at a distinct disadvantage.

¶ 21   Specifically, Roberts was able to testify only that TBBD exists due to a problem in producing collagen, that he had diagnosed one case, and that he had heard of Paterson. He explained how pediatricians identify child abuse and that TBBD children have broken bones without any form of intervening trauma. He evaluated the child's medical records in this case and concluded that TBBD existed here. He also discussed some of Paterson's work.

¶ 22   Viewing Roberts' testimony in the broadest sense, he was able to do no more than describe TBBD and assert that the child suffered from the condition. Specific evidence indicates Roberts was able to give only the most sparse explanations of the disease by reason of his limited experience in diagnosis.

¶ 23   Dr. Erickson testified to reviewing Paterson's literature, severely critiqued Roberts by stating that no one took him seriously, criticized Paterson's work, and stated that TBBD did not exist. Had Paterson testified, he would have discussed the array of cases he has seen in light of his own experience and the diagnoses arising therefrom.

¶ 24   Both Paterson and Miller had the credentials to critique and evaluate Erickson's assessment of TBBD and Erickson's harsh criticisms of Roberts. Roberts clearly lacked those credentials. Moreover, Erickson, on rebuttal, raised Roberts' credibility anew. By reason of that alone, since Miller

---

5.   Paterson was first indicated by defense counsel as perhaps the world's preeminent TBBD expert. It is obvious on this record that he was the defendant's clear preference as the expert to testify in defendant's case-in-chief and that the only reason he was not formally disclosed by the April 29 deadline was the excessive cost of bringing him from Scotland to testify. When his availability in the United States later became known, the disclosure deadline had passed and the defendant had already disclosed Dr. Roberts as the expert witness. As a consequence, defense counsel did all that he could to include testimony from Paterson, if only as a surrebuttal witness. The value of his testimony was nonetheless clear to everyone.

could not be brought in, the defense should have been given the opportunity to call Paterson as a surrebuttal witness. Based on these extraordinary facts, the "rare case" of an abuse of discretion by the trial court in refusing to admit surrebuttal testimony is present.

¶ 25 Accordingly, the trial court's ruling that excluded Paterson's testimony deprived the defendant of the only real opportunity she might have had to introduce meaningful exculpatory evidence. The exclusion culminated in her conviction and lengthy prison sentence. Had the evidence been allowed, she might have been absolved. Without it, she had little hope. The error is reversible.

### The prosecutor's duty

¶ 26 Finally, we address what we perceive as a general unwillingness of trial counsel to make reasonable concessions to accommodate one another toward the goal of achieving factual stability on the record. Perhaps this is most evident by the State's response to the disclosure of Paterson—an all out frontal attack to see that Paterson would never testify. Elements of tension between counsel are also apparent in the record as to scheduling difficulties associated with Miller's videotaped deposition and the State's subsequent *Frye* challenge. The *Frye* challenge appears as nothing more than retribution in response to defense counsel's apparent inability to budge on a deposition date that had been previously scheduled and agreed upon. We observe that this is a case in which adversarial hostility gained control with the result that justice went begging.

¶ 27 We do not belabor the point but find it appropriate to caution trial counsel to avoid extracurricular tension. It is counterproductive. The duty to accomplish justice is particularly imposed on prosecutors. The comments to ER 3.8, Arizona Rules of Professional Conduct, dealing with the "Special Responsibilities of a Prosecutor," state: "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Ariz. R. Sup.Ct. 42, ER 3.8, Rules of Professional Conduct.

¶ 28 Justice in this case dictated that a jury hear the best witness and examine the best evidence to determine whether TBBD exists in fact and whether defendant's daughter suffered from the disease. This did not happen. The State has no legitimate interest in incarcerating a parent for child abuse if in fact that parent did not abuse her child. The State should, at the very least, be interested in hearing testimony from a leading expert in the TBBD field—Paterson, Miller, or their equivalent. We simply fail to see how Paterson's exclusion and the rancor surrounding Miller's videotaped deposition furthered any reasoned view of substantial justice.

### DISPOSITION

¶ 29 The decision of the court of appeals is vacated and the matter is remanded to the trial court for a new trial consistent with this opinion.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, STANLEY G. FELDMAN, Justice, and Ruth V. McGREGOR, Justice.

MARTONE, Justice, dissenting.

¶ 30 I do not believe that the trial judge abused her discretion in granting the state's motion to exclude the testimony of Dr. Paterson as a *surrebuttal* witness. On the last day for the disclosure of experts, Talmadge listed Dr. Roberts as the defense expert. Long after the disclosure deadline, Talmadge listed Dr. Paterson as a *surrebuttal* witness. With the unexpected good news that Paterson would be in the United States, Talmadge did not seek leave to list him as a defense expert, but only as a surrebuttal witness. Then, one day before trial, Talmadge disclosed that Paterson would be available only on June 28. This would mean that in order to properly cross-examine this expert witness, the state would have had to have interviewed him on the day of his testimony. This is no way to run a trial. The trial judge properly prohibited this.

¶ 31 The general rule that witness preclusion is a remedy of last resort does not apply

to rebuttal and surrebuttal witnesses. That rule applies to witnesses called in the state's and defense's cases-in-chief. Rebuttal and surrebuttal witnesses are wholly discretionary. As we said in *State v. Steelman*, 120 Ariz. 301, 319, 585 P.2d 1213, 1231 (1978), "the decision whether rebuttal evidence should be admitted is within the sound discretion of the trial court" and "the discretion of the trial court in allowing surrebuttal testimony is even greater." Surrebuttal testimony is much like recross-examination. Most judges simply do not allow it. Indeed, unlike rebuttal evidence, surrebuttal is not even listed in the rules of criminal procedure as part of the order of proceedings in the conduct of a trial. *See* Rule 19.1(a), Ariz. R.Crim. P., (prescribing rebuttal after defense evidence, but prescribing argument after rebuttal). In my view, a trial judge cannot abuse discretion in excluding surrebuttal because a trial judge could exclude it altogether as a matter of effective trial management. Rebuttal testimony is limited to the scope of the defense's case-in-chief. Thus, there should be no new matter that would require surrebuttal. At some point, the tennis match must stop and the trial judge can properly draw the line at rebuttal testimony.

¶ 32 I do not share the view that this is one of those rare cases where it was error to exclude surrebuttal testimony. As we said in *Steelman*, to the extent that it is allowed, surrebuttal testimony is offered to explain away new evidence brought out in rebuttal (which should not happen if rebuttal is limited to the scope of the case-in-chief), "or to impeach the testimony presented in rebuttal." 120 Ariz. at 319, 585 P.2d at 1231. But impeachment attacks the credibility of a witness *qua* witness. It does not include offering substantive evidence that contradicts the testimony of another witness, whether that be characterized as "cumulative" or "corroborative."

¶ 33 Finally, I do not believe that we should criticize the lawyering in this case. *Ante,* at ¶¶ 26–28. This is not an issue raised by the parties nor is it one contained in the petition for review. Instead, I believe we have an obligation to give lawyers notice and an opportunity to be heard before we draw into question their professionalism in a published opinion.

¶ 34 In all events, I agree with the court of appeals and would affirm the judgment of the trial court.